IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ANITA HOCHENDONER;                        )
EARL HOCHENDONER; ANITA BOVA;             )
JOSEPH M. CARIK; BARBARA J. CARIK;        )
GEORGE DEMKO; MICHAEL MASULA;             )
ERIN MASULA; AMBER BRITTON;               )
SHAWN BRITTON; CHERYL BRITTON;            )
THOMAS OLSZEWSKI; DARLENE                 )
COOKINGHAM; KYLE WILLINK; TOM             )
STANZIANO; WENDY STANZIANO;               )
RICKY LADD; STACY LADD; STEVE             )
NAMNATH; HEIDI WITTENBERG; LEE            )
DEANGELIS; KATHY DEANGELIS                )
and DAVID ROBERTS;                        )
Individually and on behalf of all others  )        Civil Action No. 1:11-cv-10739-DPW
similarly situated,                       )
                                          )        JURY TRIAL DEMANDED
                    Plaintiffs,           )
            v.                            )
                                          )
GENZYME CORPORATION; and                  )
MOUNT SINAI SCHOOL OF MEDICINE            )
OF THE CITY UNIVERSITY OF NEW YORK,       )
                                          )
            Defendants.                   )

## SECOND AMENDED COMPLAINT

AND NOW come Plaintiffs Anita Hochendoner, Earl Hochendoner, Anita Bova, Joseph M. Carik, George Demko, Barbara J. Carik, Michael Masula, Erin Masula, Amber Britton, Shawn Britton, Cheryl Britton, Thomas Olszewski, Darlene Cookingham, Tom Stanziano, Wendy Stanziano, Kyle Willink, Ricky Ladd, Stacy Ladd, Steve Namnath, Heidi Wittenberg, Lee DeAngelis, Kathy DeAngelis, and David Roberts, individually and on behalf of others similarly situated, by and through their attorneys, Kurzweg Law Offices, C. Allen Black, Esq. and Matthew L. Kurzweg, Esq., and file this Second Amended Complaint.

In support thereof, Plaintiffs aver as follows:

PARTIES

1.    Plaintiff Anita Hochendoner is an adult individual who currently resides in Pittsburgh, PA.

2.    Plaintiff Earl Hochendoner is an adult individual who currently resides Pittsburgh, PA and is the spouse of Anita Hochendoner.

3.    Plaintiff Anita Bova is an adult individual who currently resides in Pittsburgh, PA.

4.    Plaintiff Joseph M. Carik is an adult individual who currently resides in North Las Vegas, NV.

5.    Plaintiff Barbara J. Carik is an adult individual who currently resides in Pittsburgh, PA and is the spouse of Joseph M. Carik.

6.    Plaintiff Michael Masula is an adult individual who currently resides in Pittsburgh, PA.

7.    Plaintiff Erin Masula is an adult individual who currently resides in Pittsburgh, PA and is the spouse of Michael Masula.

8.    Plaintiff George Demko is an adult individual who currently resides in Pittsburgh, PA.

9.    Plaintiff Amber Britton is an adult individual who currently resides in Kirkland, WA.

10.   Plaintiff Shawn Britton is an adult individual who currently resides in Marysville, WA.

11.   Plaintiff Cheryl Britton is an adult individual who currently resides Marysville, WA and is the spouse of Shawn Britton.

12.   Plaintiff Thomas Olszewski is an adult individual who currently resides in Grayling, MI.

13.   Plaintiff Darlene Cookingham is an adult individual who currently resides in Grayling, MI and is the spouse of Thomas Olszewski.

14.   Plaintiff Tom Stanziano is an adult individual who currently resides in Oldsmar, FL.

15. Plaintiff Wendy Stanziano is an adult individual who currently resides in Oldsmar, FL and is the spouse of Tom Stanziano.

16. Plaintiff Kyle Willink is an adult individual who currently resides in Delmar, DE.

17. Plaintiff Ricky Ladd is an adult individual who currently resides in Tecumseh, MI.

18. Plaintiff Stacy Ladd is an adult individual who currently resides in Tecumseh, MI and is the spouse of Ricky Ladd.

19. Plaintiff Steve Namnath is an adult individual who currently resides in San Francisco, CA.

20. Plaintiff Heidi Wittenberg is an adult individual who currently resides in San Francisco, CA and is the spouse of Steve Namnath.

21. Plaintiff Lee DeAngelis is an adult individual who currently resides in Berkeley Heights, NJ.

22. Plaintiff Kathy DeAngelis is an adult individual who currently resides in Berkeley Heights, NJ and is the spouse of Lee DeAngelis.

23. Plaintiff David Roberts is an adult individual who currently resides in Goldsboro, NC.

24. Defendant Genzyme Corporation ("Genzyme") is a corporation organized and existing under the laws of the State of Massachusetts, with its headquarters and principal place of business located at 500 Kendall Street, Cambridge, MA 02142, and doing business within Pennsylvania and the Western District of Pennsylvania and elsewhere in the United States.

25. Defendant Mount Sinai School of Medicine of the City University of New York ("Mt. Sinai") is a corporation organized and existing under the laws of the State of New York, with its headquarters and principal place of business located at One Gustave L. Levy Place, New York, NY 10029-6574. Mt. Sinai holds limited title to and is the sole licensor of U.S. Patent No. 5,356,804 to Genzyme for the manufacture of Fabrazyme®. Mt. Sinai advertises free testing for patients throughout the U.S. that may have Fabry disease. Mt. Sinai solicits and

diagnoses patients with Fabry disease throughout the U.S., including Pennsylvania and the Western District of Pennsylvania, and recommends treatment.

<u>JURISDICTION AND VENUE</u>

26. Jurisdiction is conferred upon this judicial district pursuant to federal question jurisdiction under 28 U.S.C. §1331. This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) (1) because the Plaintiffs are citizens of a State different from one or more Defendants and the aggregate amount in controversy exceeds seventy five thousand ($75,000), exclusive of interest and costs. Jurisdiction is further conferred under 28 U.S.C. §§ 1331 and 1337. This Court also has diversity jurisdiction over the Classes (as hereinafter defined) pursuant to 28 U.S.C. §§ 1332(d) (2) and (6) of the Class Action Fairness Act of 2005 because one or more members of the Classes are citizens of a State different from one or more Defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

27. This action was originally filed in the United States District Court for the Western District of Pennsylvania and transferred to this Court upon Defendants' motion. Jurisdiction is found in the district court in which the action was first filed under the *Erie* doctrine, and additionally conferred by Pennsylvania's long-arm statute, 42 Pa.C.S. §5322(a)(1-4). As such, the United States District Court for the Western District of Pennsylvania has jurisdiction pursuant to 42 Pa.C.S.§5322 and 28 U.S.C. § 1391(a)(2) and(b)(2) because Defendants transact business within the Western District of Pennsylvania by medical testing, direct sale or underlying license agreements with four of the Plaintiffs, and injury to these four or more of the Plaintiffs occurred in this district.

28. Venue is proper in the transferor court, the United States District Court for the Western District of Pennsylvania, pursuant to 42 Pa.C.S. §5322 and 28 U.S.C. § 1391(a)(2) and(b)(2) because Defendants transact business within the Western District of Pennsylvania by medical testing, direct sale or underlying license agreements with four of the Plaintiffs, and injury to these four or more of the Plaintiffs occurred in this district.

29. Venue is also proper in the transferee court, the United States District Court for the District of Massachusetts.  Defendants' motion to transfer from the United States District Court for the Western District of Pennsylvania was granted solely for the convenience of the parties and witnesses, not any underlying defect in exercising jurisdiction or venue.  *See* 28 U.S.C. § 1404(a).

30. Jurisdiction is proper in the transferor court and, thus, in the transferee court.  However, the United States District Court for the District of Massachusetts also has direct jurisdiction over the instant case because Mt. Sinai and Genzyme expressly provided for such jurisdiction in their license agreement to provide Fabrazyme® to Fabry patients as intended third party beneficiaries.  Specifically, the Defendants' license agreement provides that Mt. Sinai licenses the patent to Fabrazyme so it will be "developed and made available for general use to patients for the treatment of Fabry Disease, and for these purposes is willing to grant an exclusive license to GENZYME upon the terms and conditions set forth below."  *See*, Exhibit A to Defendants' Motion to Dismiss (Document 22-1 Filed 05/12/11 Page 2 of 20).  Defendants' license agreement further provides that "any and all claims, disputes or controversies arising under, out of, or in connection with this Agreement, which have not been resolved by good faith negotiations between the parties, shall be resolved by final and binding arbitration in Boston, Massachusetts" and "[a]ny award rendered in such arbitration

may be enforced by any of the parties in the United States District Court for Massachusetts, to whose jurisdiction for such purposes MSSM [Mt. Sinai] and GENZYME each hereby irrevocably consents and submits." *Id*. at 7-8.

31. The license agreement according to its terms is to be interpreted under New York law, which does not bind non-signatories to arbitration absent narrow exceptions, which exceptions are not present here. The provisions of the license agreement are severable, and the benefits of the contract including consent to jurisdiction in the United States District Court for the District of Massachusetts inure to the intended third-party beneficiaries named as Plaintiffs in this Second Amended Complaint. *Id.*

32. Additional out-of-state Plaintiffs join the instant case under the Rule 20(a)(1)(A) and (B) of the Federal Rules of Civil Procedure, as all injuries arose from a common fact and present a common question of law.

FACTUAL BACKGROUND

33. The instant case arises from Defendants' actions to prevent certain patients in the United States from obtaining the full United States Food and Drug Administration ("FDA") approved and recommended dose of Fabrazyme® for treatment of Fabry disease (diluted in certain instances to only 30% of the approved and recommended dose), and banning the remaining U.S. Fabry patients from receiving Fabrazyme® treatment. As a result, Fabry patients throughout the United States are suffering grave bodily harm and dying from the drug dilution of the American supply. Despite their actions in the U.S., Genzyme provides full dose Fabrazyme® treatment to all of its European patients, and continues to expand the overseas market to include more European Fabry patients given full doses.

34.     Plaintiffs Anita Hochendoner, Anita Bova, Joseph M. Carik, George Demko, Michael Masula, Amber Britton, Shawn Britton, Thomas Olszewski, Kyle Willink, Tom Stanziano, Ricky Ladd, Steve Namnath, Lee DeAngelis, and David Roberts suffer from Fabry Disease, which is heritable genetic illness and results in the body being unable to synthesize the enzyme alpha-galactosidase A, which is critical for the degradation and export of fats from cells.

35.     Fabry Disease is a life-threatening illness and without treatment results in the premature death of Fabry patients from complications such as renal disease, heart attack, and stroke.

36.     Left untreated, Branton *et al.*, "Natural History and Treatment of Renal Involvement in Fabry Disease;" J. Am. Soc. Nephrol. 13:S139-S143 (2002) found from survival analysis that 50% of patients developed End Stage Renal Disease "ESRD" by 53 years, with a range of 21 to 56 years.  Importantly, all patients in this National Institute of Health ("NIH") study who lived into their 50s developed ESRD.

37.     While no cure for Fabry Disease is yet available, one of the greatest breakthroughs in scientific research on Fabry Disease has been the discovery that enzyme replacement therapy with agalsidase beta (Fabrazyme®) can effectively treat Fabry patients.

38.     The scientific research on Fabry Disease that led to the breakthrough was a direct result of taxpayer funding.

39.     Specifically, the NIH awarded grant no. DK 34045 to Dr. Robert J. Desnick ("Desnick") at the Mount Sinai School of Medicine of New York University to develop Fabrazyme® as an enzyme replacement therapy to treat Fabry Disease.

40.   Mt. Sinai was granted U.S. Patent No. 5,356,804 to a method of producing agalsidase beta subject to the requirements and obligations of 35 U.S.C. §§ 200-212, commonly known as the Bayh-Dole Act.

41.   Mt. Sinai exclusively licensed U.S. Patent No. 5,356,804 for the manufacture of agalsidase beta (Fabrazyme®) to Genzyme Corporation, which is the sole supplier of the drug to the U.S. marketplace.

42.   In April 2003, the FDA granted approval for Genzyme to market Fabrazyme® for treatment of Fabry patients.

43.   The FDA approval of Fabrazyme® is based on a recommended prescribed dose of 1 mg/kg body weight infused every two weeks as an intravenous (IV) infusion.  *See* FDA approved package insert, attached hereto and incorporated herein as Exhibit A.

44.   The pharmacological effectiveness of Fabrazyme® is diminished or negated by reducing the given dose below the FDA recommended 1mg/kg, by reducing the dosage frequency by less that the FDA recommended every two weeks, or reducing both below FDA recommendations in combination.

45.   No other enzyme replacement therapy is approved in the U.S., although a slightly different molecule, designated agalsidase-alfa (Replagal®) is marketed overseas for treatment of Fabry Disease.

46.   From the date of approval until approximately June 2009, Genzyme was able to manufacture enough Fabrazyme® to treat all currently diagnosed Fabry patients in the U.S.

47.   However, sometime before June 2009, Genzyme decreased production of Fabrazyme® as a result of a viral contamination in their Allston Landing, MA manufacturing plant.

48.   Genzyme caused the viral contamination of Fabrazyme® by failing to clean and sterilize

their bioreactors between production batches, and thus introduced the virus by cross-contamination.

49.    Specifically, Genzyme would use the same bioreactors to produce both Fabrazyme® and a different biological drug, Cerezyme®, which is used to treat another enzyme deficiency termed Gaucher disease.

50.    The Cerezyme® production batches were initially contaminated with the non-human Vesivirus 2117, leading to a shortage of Cerezyme®.

51.    Genzyme then cross-contaminated Fabrazyme® cultures by failing to properly clean and sterilize the bioreactors before switching it for Fabrazyme® production leading to a shortage of Fabrazyme®.

52.    The Allston Landing facility was the subject of a FDA warning letter that followed an inspection in September and October of 2008.  One of the FDA's concerns was controls to protect against microbial contamination.

53.    Genzyme additionally shifted capital away from production and maintenance of Fabrazyme® stocks, leading to foreseeable insufficient capacity and inventory to mitigate any shortages it would encounter, despite the FDA warning.

54.    Further, in November 2009, Genzyme produced Fabrazyme® vials that contained contaminants of particulate steel, glass and rubber.

55.    The FDA initiated action against Genzyme which resulted in a consent decree in May 2010, which included a $175 million dollar fine and oversight of the manufacture of Fabrazyme® for at least seven years.

56.    In June 2009, as a direct result of its reduced production of Fabrazyme®, Genzyme unilaterally implemented a rationing plan for its reduced supply of Fabrazyme® for the then

known Fabry patients, wherein Genzyme unilaterally diluting the effective dose for known Fabry patients to only less than one-third (1/3) of the recommended prescribed dose ("Genzyme Rationing Plan").

57.   By and through the Genzyme Rationing Plan, Genzyme also unilaterally barred any newly diagnosed patients from receiving Fabrazyme®.

58.   Physicians only prescribe the recommended dose of 1mg/kg of Fabrazyme® infused every two weeks for their patients, in accordance with FDA recommendations and the sole approved use of Fabrazyme®.

59.   Under the Genzyme Rationing Plan, Genzyme refuses to honor U.S. doctors' prescriptions for full undiluted doses of Fabrazyme®, thereby forcing U.S. physicians to administer a drastically lowered dose contrary to their best medical judgment.

60.   The Genzyme Rationing Plan physically prevents physicians from exercising independent judgment for treating Fabry patients.

61.   The Genzyme Rationing Plan has never been FDA approved, nor has Genzyme or Mt. Sinai sought approval by the FDA of the Genzyme Rationing Plan.  Dilution of drug doses for chronically ill patients has never been recommended by any medical authority.

62.   As part of and in furtherance of the Genzyme Rationing Plan, Genzyme and Mt. Sinai Hospital promulgated new treatment recommendations in an attempt to supersede the previously FDA approved recommendations present in the labeling insert for Fabrazyme®.

63.   Specifically, on September 23, 2009, Genzyme organized and underwrote a meeting termed the U.S. Fabrazyme Stakeholder's Working Group ("FSWG").

64.   The document produced from the meeting is titled: Revised Guidance to the U.S. Fabry Community: Management of Fabrazyme® (agalsidase beta for injection) Supply ("Revised

10

Guidance Document"). *See* Revised Guidance Document, a true and correct copy of which is attached hereto and incorporated herein as Exhibit B.

65. The members of FSWG included Genzyme Employees and Institutional representatives from the University of Iowa Hospitals and Clinics, Columbia University Medical Center, Children's Memorial Hospital, Baylor College of Medicine, Cincinnati Children's Hospital Medical Center, University of Minnesota, Duke University Health Center, University of Washington, Massachusetts General Hospital, University of Alabama at Birmingham, Cedar's-Sinai Medical Center, the National Fabry Disease Foundation, and the Fabry Support and Information Group.

66. The FSWG members all have received compensation in some form by Genzyme. Specifically, the Revised Guidance Document states that "some individuals who participated in the FSWG are employees of Genzyme and other individuals or their institutions or organizations receive or have received funding from Genzyme for research, education activities, and other purposes." *Id.*

67. Genzyme excluded important other stakeholders such as the FDA, the NIH, independent experts, and Fabry patients from participation, thus limiting the Fabry Stakeholders Working Group to only financial "stakeholders" with Genzyme.

68. Genzyme regularly continued to reference the non-FDA approved Revised Guidance Document to doctors and patients with its supply updates as for example in its January 21, 2011 supply update to patients, but excludes the document from the FDA product insert for Fabrazyme®.

69. Genzyme intended to and succeed in inducing reliance on its treatment recommendations as acknowledged in Executive Summary – 2009 Business Plan presented by Genzyme

employee Jeanne Penn's slide presentation on August 18, 2009, wherein Genzyme stated that "in consultation with key stakeholders, we [Genzyme] worked to develop Cerezyme and Fabrazyme dose conservation guidelines."

70.    In the presentation of August 18, 2009, Genzyme also reported that "[i]nitial adoption of the Fabrazyme Stakeholders Working Group (FSWG) guidelines appears to be strong" and that "those in the Fabry community that have adopted the FSWG guidelines should be encouraged to continue to do so. Moreover, "[t]hose in the community that have not yet adopted the FSWG guidelines are encouraged to consider doing so."

71.    Jeanne Penn was at the time of the presentation a director of Competitive & Technical Information for Genzyme and based out of Cambridge, MA.

72.    Genzyme and Mt. Sinai, by organizing, deciding, promulgating, and inducing reliance on the FSWG treatment guidelines outside of FDA approval process, assumed an additional duty of care to Fabrazyme® patients because patients in the U.S. were banned from receiving the FDA-approved dosage of Fabrazyme under the Genzyme Rationing Plan. As such, Genzyme's development of guidelines for "dose conservation" (i.e., dose dilution) provided the only information to doctors and patients regarding diluted doses of Fabrazyme®.

73.    Until about June 2009, Plaintiffs Joseph M. Carik, George Demko, Michael Masula, Anita Hochendoner, Anita Bova, Kyle Willink, Tom Stanziano, Ricky Ladd, Steve Namnath, Lee DeAngelis, David Roberts, and Thomas Olszewski, and all other then known Fabry patients similarly situated, were receiving the FDA recommended prescribed dose, but after June 2009, Genzyme diluted their respective doses to less than one-third of the FDA approved dose pursuant to the Genzyme Rationing Plan.

74.    On or about January 2010, pursuant to the Genzyme Rationing Plan, Genzyme slightly

increased doses to only 50% of the FDA recommended prescribed dose to Plaintiffs Joseph M. Carik, George Demko, Michael Masula, Anita Hochendoner, Anita Bova, Kyle Willink, Tom Stanziano, Ricky Ladd, Steve Namnath, Lee DeAngelis, David Roberts, and Thomas Olszewski, and all other then known Fabry patients similarly situated.

75.   On March 25, 2011, Genzyme announced they it had destroyed yet another lot of defective Fabrazyme®, leading to another shortage in which patients missed or will miss infusions for the months of May and June of 2011.

76.   On March, 25, 2011, Genzyme also announced it was reallocating stocks away from U.S. patients that received diluted doses of drug to overseas patients, so as to provide full dose treatment to Europeans, despite overseas patients having access to the alternative treatment, Replagal®.  The letter states to U.S. patients  that the reason for the reallocation is to "to help share the impact of this loss," when in fact only U.S. patients actually felt the impact of the "loss" by receiving even more dilute doses so the Europeans could remain on full dose. *See* March 25, 2011 Genzyme letter, which is attached hereto and incorporated herein as Exhibit C.

77.   As of this filing, two years after the Genzyme Rationing Plan began, Plaintiffs Joseph M. Carik, George Demko, Michael Masula, Anita Hochendoner, Anita Bova, Kyle Willink, David Roberts, Tom Stanziano, Ricky Ladd, Steve Namnath, Thomas Olszewski, Lee DeAngelis, Amber Britton, and Shawn Britton as well as all other Fabry patients similarly situated in the United States being treated with Fabrazyme® still do not receive the FDA approved dose from Genzyme as a direct result of the Genzyme Rationing Plan.

78.   Plaintiffs Amber Britton and Shawn Britton were diagnosed with Fabry disease after June 2009.

79. Under the Genzyme Rationing Plan, after June of 2009, Genzyme barred all newly diagnosed Fabry patients from receiving any Fabrazyme®.

80. Under the Genzyme Rationing Plan, Genzyme barred Plaintiffs Amber Britton and Shawn Britton and all other Fabry patient similarly situated from receiving Fabrazyme®, despite immediate treatment with Fabrazyme® being medically indicated.

81. As of March 2011, Amber Britton and Shawn Britton began to receive a diluted dose of Fabrazyme®.

82. As of this filing, almost two years after the Genzyme Rationing Plan began, Genzyme still bars Fabrazyme® access to many United States citizens similarly situated and diagnosed with Fabry disease after June 2009.

83. U.S. children with Fabry also received diluted doses of Fabrazyme® under the Genzyme Rationing Plan.

84. Genzyme reported in its latest supply update that "many children have grown significantly since the start of the supply shortage and are now receiving less than 1 mg per kilogram of Fabrazyme per shipment. In order to correct for this, beginning June 1, 2011 we are able to accommodate increases in total Fabrazyme dose due to weight gain for children and adolescents currently age 21 years and under." *See* Genzyme supply update attached hereto and incorporated herein as Exhibit D.

85. The Genzyme Rationing Plan thus effectively under-doses U.S. children even more so than adult U.S. Fabry patients.

86. Because Fabry is inherited, both parents and their children often require treatment; however, under the Genzyme Rationing Plan, U.S. parents are not allowed to sacrifice their dose to save their children.

87.     Defendant Mt. Sinai knew of the Genzyme Rationing Plan, and despite having statutory and contractual duties to the contrary described hereinafter and with full knowledge that Genzyme had breached its agreement to provide Fabrazyme® to all Fabry patients, approved of and consented to the Genzyme Rationing Plan under its exclusive license agreement with Genzyme and through Desnick's consultations with Genzyme.

88.     Genzyme was aware of adverse events and the potential for such adverse events by diluting the dose of Fabrazyme® below FDA approved levels.

89.     Similarly, Mt. Sinai as well as its employee and concurrent Genzyme agent, Desnick, were also aware of adverse events and the potential for such adverse events associated with Genzyme's Rationing Plan, but consented and maintained consent for licensing the patent for Fabrazyme® despite having a duty to protect against the invention's unreasonable use and non-use under the Bayh-Dole Act and a duty of care to ensure the safety of Fabry patient consistent with its contractual obligations to such third party beneficiaries in the event of breach.

90.     Mt. Sinai never informed the NIH of the Genzyme Rationing Plan and the resultant unreasonable use and non-use of the invention under the Bayh-Dole act, thereby concealing the violations of the Bayh-Dole act from the NIH.

91.     Neither Mt. Sinai nor Genzyme has ever applied for, much less obtained, regulatory approval of the Genzyme Rationing Plan and administration of a diluted Fabrazyme® dose to treat Fabry disease, but instead promulgated its own treatment guidelines in contravention to the FDA approval process.

92.     The Genzyme Rationing Plan and the product inserts provided with diluted drug doses are not in compliance with Federal laws regarding sale of prescription drugs in the U.S.

93.    The additional treatment guidelines provided for administration of Fabrazyme® which were promulgated by Genzyme in consultation with the FSWG are not in compliance with Federal laws regarding labeling of prescription drugs in the U.S.

94.    The Genzyme Rationing Plan and the product inserts provided with the diluted drug doses are not in compliance with Federal laws regarding licensing of publicly-funded inventions under the Bayh-Dole act.

95.    The Genzyme Rationing Plan breaches the contract with Mt. Sinai, which expressly provides for treatment of Fabry patients as intended third party beneficiaries.

96.    Neither Mt. Sinai nor Genzyme has warned doctors or doctor's patients as to what adverse events have been observed or could result from the Genzyme Rationing Plan.

97.    Neither Mt. Sinai nor Genzyme has ever shown that a diluted dose of Fabrazyme® is either safe or efficacious for treating Fabry disease, and in fact, has overwhelming medical evidence to the contrary of the grave dangers of diluting the dose below FDA approved levels.

98.    On February 17, 2010, Genzyme reported to European Physicians that "All patients, especially those with adjusted dose regimes should be under close clinical surveillance. A medical examination, including all relevant clinical parameters, should be performed every two months. It is of the utmost importance to monitor plasma [globotriaosylceramide] GL-3 or urinary GL-3 levels, as for the moment the GL-3 level is the most sensitive parameter. Patients who demonstrate a deterioration of disease should reinitiate the original treatment with Fabrazyme." (Emphasis added). (*See* [European] Healthcare Professional Communication (February 17, 2010), attached hereto and incorporated herein as Exhibit E.)

99.    On April 22, 2010, Genzyme stated that European "physicians are advised to reinitiate the

treatment with the original dosing regime or initiate a treatment with alternative approved medicinal product" for those experiencing "aggravation of disease symptoms and/or adverse events ascribed to the lowered dose of Fabrazyme."  (Emphasis added)  (*See* [European] Direct Healthcare Professional Communication (April 22, 2010), attached hereto and incorporated herein as Exhibit F.)

100.    On July 5, 2010, Genzyme reported to European Physicians that "in situations where alternative treatment is not available or where (continuation of) medical treatment with Fabrazyme is deemed medically necessary it is important to note that an increase in clinical manifestations indicative of Fabry disease progression has been observed on lowered dose." (*See* [European] Direct Healthcare Professional Communication (July 5, 2010), attached hereto and incorporated herein as Exhibit G.)

101.    On January 21, 2011, Genzyme reported to U.S. physicians that "[b]ecause Fabry disease is a complex condition, there is no clear way to decide which patients are in greatest need of treatment." (*See* RE: U.S. Supply of Fabrazyme® (agalsidase beta) for February – April 2011 (January 21, 2011), attached hereto and incorporated herein as Exhibit H.)

102.    However, as early as October 22, 2010, the European Medical Agency ("EMA") issued a press release stating that "The [European Medicines Agency's Committee for Medicinal Products for Human Use] CHMP is now recommending that physicians switch back to prescribing the full dose of Fabrazyme® according to the authorised product information, depending on the availability of enzyme replacement therapy and the severity of the disease."  *See* EMA recommendation for full dosage of Fabrazyme® for Fabry Patients attached hereto and incorporated herein as Exhibit I.

103.    The EMA's recommendation was based on the observation "that since the introduction of a

lower dose of Fabrazyme® in June 2009, there has been a steady increase in the number of reported adverse events, matching the increase in the number of patients on the lower dose. At first, most of the events were pain-related, soon followed by reports of events affecting the heart, the central nervous system and the kidneys." *Id.*

104.   On November 16, 2010, the EMA publicly published a statistical study on the Fabrazyme® supply shortage in Europe, which showed that patients not only had a return of life threatening symptoms but also an <u>accelerated</u> course of deterioration on the lowered dose. *See* EMA study attached hereto and incorporated herein as Exhibit J.

105.   The EMA found that "In the early stages of the shortage the main increases in AEs [adverse events] were related to pain/paresthesia events, while later on in the shortage period, the main increases were in serious cardiac events such as myocardial infarction, in serious nervous disorders such as stroke, and – possibly to a lesser extent – in renal disorders. There have been consistent reports of a higher percentage of patients reporting peripheral pain, abdominal pain and diarrhoea on a daily basis after 25 June 2009 (start of the shortage)." *Id.*

106.   Genzyme participated in the EMA study as part of its administration of the "Fabry Registry," a database collecting information on all Fabry patients, and Genzyme was aware of the EMA's results.

107.   Genzyme did not and has not informed U.S. doctors or patients of the results of the EMA study.

108.   Genzyme has not disclosed to U.S. doctors or patients the need for medical examinations every two months for U.S. patients despite recommending such a standard of care for European patients.

109.   Genzyme has not convened another working group to address any additional information it

has discovered or promulgated any new treatment guidelines since September 2009 or requested FDA approval to modify the labeling for Fabrazyme® despite an ongoing duty to update and its treatment guidelines while the drug is given at diluted doses.

110.    Genzyme has not disclosed to U.S. doctors or patients the need to monitor plasma or urinary GL-3 levels every two months for U.S. patients, despite such monitoring being of "utmost importance" for the standard of care for at least for European patients.

111.    Genzyme has not disclosed to U.S. doctors or patients that "clinical manifestations indicative of Fabry disease progression has been observed on lowered dose," despite admitting to European physicians the importance of such observations especially "in situations where alternative treatment is not available" such as the U.S.

112.    Genzyme has not advised U.S. physicians to reinitiate the original full dose treatment for U.S. patients that have disease progression, despite advising European physicians to take such action to protect the health and safety of European Fabry patients.

113.    Genzyme does not and will not provide drug to U.S. patients to reinitiate treatment with a full dose if they experience disease progression on the diluted dose, despite advising and accordingly providing full drug access for European patients experiencing disease progression.

114.    Genzyme not only bars Americans from receiving FDA-approved treatment, but is also expanding its market overseas while Americans are being given diluted doses.

115.    In November 2010, Linthorst et al. reported that "Genzyme announced that supplies [of Fabrazyme] would increase during the last three months of 2010. This amount is equivalent to treatment of a total number of 400 patients at a dose of 1.0 mg/kg EOW. This means that additional Fabrazyme will be available both to restore the dose in those patients currently on

low dose to 1.0 mg/kg EOW and for 80 additional patients (either previously untreated patients or those who need to switch from Replagal).  Linthorst et al., "Expert opinion on temporary treatment recommendations for Fabry disease during the shortage of enzyme replacement therapy (ERT)," *Molecular Genetics and Metabolism* 102:99–102 (2011).

116.   One of the Linthorst article's authors, Derralyn Hughes, was a paid consultant for Genzyme.  David Warnock attended the "Expert meeting on October 9, 2010" leading to the article.  He is also a paid consultant for Genzyme as well as being a member of the FSWG which recommended treatment guidelines for American patients, and also receives NIH funding.

117.   Genzyme informed U.S. patients and doctors that "[a]ll countries and regions should participate in an equitable manner proportional to demand."  *See* Exhibit B, Revised Guidance Document, 4.

118.   Despite such language indicating the importance of equitable treatment for all patients worldwide, Genzyme provided an exception to their ostensible "equity" rule for treatment to exclude Europeans from the Genzyme Rationing Plan.

119.   Genzyme is offering undiluted doses to European patients in order to mitigate the erosion of the European market share for Fabrazyme by Replagal®.

120.   Genzyme does not offer and provide FDA approved doses of Fabrazyme® for U.S. patients because there is no threat of loss of market share in the United States.  Unlike Europe, Replagal® is not FDA-approved for use in the United States for treatment of Fabry disease, and since Genzyme is the sole supplier of Fabrazyme® under the patent monopoly from Mt. Sinai, Genzyme has no competition in the U.S.

121.   In August of 2010, Plaintiffs Joseph Carik, Anita Hochendoner, Anita Bova and Amber Britton requested that the NIH exercise its march-in rights under the Bayh-Dole Act to allow

other manufacturers to enter the market to make Fabrazyme® under U.S. Patent No. 5,356,804.

122.  On December 1, 2010, the NIH denied the petitioners' request stating that the three-year approval process for new manufacturers under FDA regulations render the Bayh-Dole remedy of march-in useless for alleviating drug shortages in a timely manner, despite the NIH recognition of the critical health need of patients for the drug.

123.  Due to Genzyme's most recent manufacturing failure announced on March 25, 2011, the NIH has re-opened the Fabrazyme® march-in case based on the new information regarding further manufacturing disruptions and shortages as well as Genzyme's decision to allocate full doses to Europeans, who have an alternative available, thereby, causing preferential injury American Fabry patients.  The case is currently pending.

124.  As a direct result of manufacturing disruptions, Genzyme is forcing patients to miss doses, which results in an increased risk and severity of acute adverse reactions due to inconsistent infusion schedules.

125.  As a direct result of the Genzyme Rationing Plan and Genzyme's denial of access to drug, dilution of the dose of drug, change in dosing schedules, and sale of adulterated drug, Fabry patients have had a return of symptoms, accelerated disease development, injury, and otherwise preventable disease progression; or Fabry patients have died from these injuries.

126.  Mt. Sinai licenses U.S. Patent No. 5,356,804 to Genzyme specifically to benefit third parties having Fabry disease, specifically, "to have recombinant x-galactosidase A developed and made available for general use to patients for the treatment of Fabry Disease and for these purposes is willing to grant an exclusive license to GENZYME upon the terms and conditions set forth below."  *See*, Exhibit A to Defendants' Motion to Dismiss (Document

22-1 Filed 05/12/11 Page 2 of 20).

127.   Mt. Sinai is involved in the manufacture and use of Fabrazyme® under its license agreement with Genzyme.  Specifically, Mt. Sinai provides "Technical information" to Genzyme which is defined as "any and all proprietary technical data, know-how, information and material relating to the Product, its manufacture or use.  *Id.* at 3.

128.   Mount Sinai solicits and provides ostensibly free testing for Fabry disease to all U.S. residents, including Pennsylvanians, hereinafter referred to as the "Mt. Sinai Fabry Testing Program."

129.   Desnick, an inventor of Fabrazyme®, an employee of Mt. Sinai and concurrent consulting agent for Genzyme, diagnoses Fabry patients under the Mt. Sinai Testing Program, although his relationship is not disclosed to such patients.

130.   Plaintiffs Michael Masula, a Pennsylvania resident, and Kyle Willink, a Delaware resident, were diagnosed under the Mt. Sinai Fabry Testing Program.

131.   On March 25, 2008, Plaintiff Michael Masula received a diagnosis from Mt. Sinai signed by Desnick.  The communication to Michael Masula states "It is strongly recommended that the patient be clinically evaluated by a Fabry specialist and treatment for Fabry disease be discussed with the patient."

132.   Michael Masula's positive diagnosis under the Mt. Sinai Testing Program was accompanied by a solicitation for Michael Masula to recommend the Mt. Sinai Testing Program to others, as well as an obtain genetic counseling from Mt. Sinai.  Specifically, Mt. Sinai states in its diagnoses that "It is also recommended that other at-risk family members be informed of the availability of testing to determine whether they have the family's alpha-galactosidase A gene mutation.  Genetic counseling with regard to these test results is available through the

Department of Genetics and Genomic Sciences, Mount Sinai School of Medicine, New York (1-866-322-7963)."

133.   As a result of the solicitation and subsequent testing, Mt. Sinai and Desnick received patent royalties from patients treated with Fabrazyme®, including Plaintiffs Michael Masula, Kyle Willink, and all other American Fabry patients.

134.   Mt. Sinai holds medical records for Fabry patients placed on Fabrazyme® after being diagnosed under the Mt. Sinai Fabry Testing Program, including records for Plaintiffs Michael Masula, and Kyle Willink.

135.   At all times relevant hereto, Desnick was and is a paid consulting agent for Genzyme as well as being an employee of Mt. Sinai.  Desnick did not disclose his or Mt. Sinai's financial interests in his communications with Fabry patients

136.   Mt. Sinai knows of and consents to Desnick's consultations with Genzyme.

137.   Mt. Sinai, Genzyme, and Desnick are signatories to the contract licensing Fabrazyme® to be generally developed and used to treat Fabry patients as third party beneficiaries.  *See*, Exhibit A to Defendants' Motion to Dismiss (Document 22-1 Filed 05/12/11 Page 13 of 20).

138.   Desnick has consulted and continues to consult for Genzyme.  His actions and inclusion as a signatory on the contract executed for the purpose of providing treatment with Fabrazyme® provide a nexus between Mt. Sinai, Genzyme, and patients solicited and diagnosed under the Mt. Sinai Testing Program and subsequently treated with Fabrazyme®.

139.   Fabry patients that are being administered Fabrazyme® do not receive title to the drug, the patent, or obtain any other property right in Fabrazyme®.

140.    Anita Hochendoner, a Fabry patient that is not currently in renal failure, requested that Genzyme transfer her dose to her daughter who also has Fabry disease, Anita Bova.  Anita

Bova is in renal failure and would likely benefit from receiving the original FDA approved dose as she had before receiving the diluted dose of Fabrazyme®.

141.   Genzyme refused Anita Hochendoner's request because she does not have a right to control the product, even where she is sacrificing her own allocation in an attempt to save her daughter's life.

142.   Genzyme informed Anita Hochendoner that if she relinquished her drug allocation, it would not go to her daughter, but instead it would be placed back into the "general pool." Genzyme also informed Anita Hochendoner that if she relinquished her dose, she would be moved to end of the line for receiving future allocations of Fabrazyme®.

143.   Genzyme uses the "general pool" of Fabrazyme® to maintain United States patients on diluted doses.

144.    However, Genzyme also uses the "general pool" as a reserve inventory for overseas patients so that they can continue to receive a full dose in the event of supply disruptions, as occurred on March 25, 2010 where doses were allocated away from the general reserve (including U.S. children) to maintain full doses for Europeans.

<u>CLASS ALLEGATIONS</u>

145.   Paragraphs 1 through 144 are incorporated hereunder as though fully set forth at length.

146.   Plaintiffs are bringing this action on behalf of themselves and all others similarly situated, which includes any and all individuals residing in the United States who have been diagnosed with Fabry disease, and their spouses ("Classes").

147.   The proposed Classes are so numerous that joinder of all members of the Classes is impractical and the administration of the claims as set forth herein on behalf of the Classes is more efficient and will benefit the parties and the Court.

148.   The questions of law and fact common to the Classes predominate over the questions affecting only individual members of the Classes.

149.   Plaintiffs' claims as set forth herein are typical of the claims of the Classes, as they have all suffered a similar harm as a result of the Defendants' actions and omissions.

150.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes because their interests do not conflict with the interests of the individual members of the Classes. Plaintiffs have retained competent and experienced counsel to represent themselves and the members of the Classes.

151.   Adjudication of the claims set forth herein as a class action is superior to individual litigation of the claims, which would be impractical, expensive, and unduly burdensome to the Court.

## COUNT I: NEGLIGENCE

**ANITA HOCHENDONER, ANITA BOVA, JOSEPH M. CARIK, GEORGE DEMKO, MICHAEL MASULA, DAVID ROBERTS, TOM OLSZEWSKI, KYLE WILLINK, TOM STANZIANO, RICKY LADD, STEVE NAMNATH, AMBER BRITTON, AND SHAWN BRITTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

152.   Paragraphs 1 through 151 are incorporated hereunder as though fully set forth at length.

153.   The injuries sustained by Plaintiffs were due to and were the direct and proximate result of the negligence, carelessness, and recklessness of Defendants Genzyme and Mt. Sinai generally, and under the following particulars:

    a.   in that Defendants failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;

    b.   in that Defendants failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

    c.   in that Defendants failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;

    d.   in that the Defendants unilaterally devised, implemented, and approved with knowledge and consent the Genzyme Rationing Plan, and otherwise reduced

or consented to reducing the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients;

e.  in that Defendants sold Fabrazyme® vials contaminated with glass, rubber and steel particles;

f.  in that the Defendants designed, implemented and consented to the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

g.  in that the Defendants instructed and through knowledge and consent reduced the dose of Fabrazyme® to dangerous, sub-efficacious and unapproved levels;

h.  in that the Defendants barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i.  in that the Defendants failed to test or require the testing of the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

j.  in that the Defendants failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

k.  in that the Defendants failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

l.  in that the Defendants failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions; and

m.  in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

154.  As a direct and proximate result of the negligence of Defendants, the Plaintiffs have sustained or are at imminent risk of sustaining the following serious injuries, some or all which may be of a permanent nature:

a.  renal injury;

b.  cardiac injury;

c.  neurological injury;

d.  peripheral pain;

    e.      chronic abdominal pain and diarrhea;

    f.      impairment of vision;

    g.      impairment of hearing;

    h.      increased severity and likelihood of infusion reactions, and

    i.      premature death and other serious and permanent injuries.

155.    As a direct and proximate result of the aforesaid injuries, Plaintiffs have been damaged as follows:

    a.      Plaintiffs have been and will be required to expend large sums of money for medical and surgical attention, medical and surgical supplies, medical and surgical appliances, and medicines;

    b.      Plaintiffs have suffered and will continue to suffer great pain, suffering, inconvenience, impairment of bodily function, and mental anguish;

    c.      Plaintiffs have been and will be deprived of earnings and earning capacity;

    d.      Plaintiffs have suffered loss of enjoyment of life;

    e.      Plaintiffs have died or suffered a reduced life expectancy; and

    f.      Plaintiffs' general health, strength and vitality have been impaired.

WHEREFORE, Plaintiffs Anita Hochendoner, Anita Bova, Joseph M. Carik, George Demko, Michael Masula, David Roberts, Kyle Willink, Tom Stanziano, Ricky Ladd, Steve Namnath, Thomas Olszewski, Amber Britton, and Shawn Britton, individually and on behalf of all others similarly situated, demand judgment against Defendants, Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with costs of suit.

## COUNT II: NEGLIGENCE *per Se*

**ANITA HOCHENDONER, ANITA BOVA, JOSEPH M. CARIK, GEORGE DEMKO, MICHAEL MASULA, KYLE WILLINK, TOM STANZIANO, STEVE NAMNATH, DAVID ROBERTS, INDIVIDUALLY AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

156.    Paragraphs 1 through 155 are incorporated hereunder as though fully set forth at length.

157.   Defendants Genzyme and Mt. Sinai are strictly liable to Plaintiffs as follows under the Food, Drug, and Cosmetics Act 21 U.S.C. §351(a-d) regarding adulterated products, 21 USC §352(f) regarding adequate warning and labeling, 21 U.S.C. §355(j) regarding the statutory approval process for testing of previously unapproved doses, and 21 U.S.C. §356a(a) regarding testing required for substantial manufacturing changes; as well as being strictly liable under the Bayh-Dole Act 35 U.S.C. §200 regarding the prohibition of unreasonable use or non-use of Bayh-Dole regulated inventions which are necessary for human health:

   a.   for restricting and consenting to restriction of administering Fabrazyme® at a dose that is below the FDA approved use of 1 mg/kg body weight infused every two weeks;

   b.   in that the Defendants barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

   c.   for failing to seek FDA approval for using the diluted dosage to treat Fabry disease;

   d.   for selling Fabrazyme®, which is FDA non-compliant and further adulterated with glass, rubber and steel particles;

   e.   for failure to give adequate and complete warnings of the known or knowable dangers involved in the use Fabrazyme® at a diluted dose as required by FDA regulations;

   f.   for unreasonably using a publicly funded invention by restricting administration to below the FDA approved dose and for non-use of the invention by banning the publicly funded invention from being given to newly diagnosed Fabry patients;

   g.   for failing to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

   h.   for failing to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions; and

   i.   in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

158.   By virtue of the negligence *per se* of Defendants, Defendants are liable for the severe

injuries and conditions as set forth herein in Count I of Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink, Steve Namnath, Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano, David Roberts, and all others similarly situated.

159.   As a direct and proximate result of the aforesaid injuries, Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink, Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano, Steve Namnath, David Roberts, and all others similarly situated have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink, Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano, Steve Namnath, and David Roberts, individually and on behalf of all others similarly situated, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with costs of suit.

## COUNT III: STRICT LIABILITY

**ANITA HOCHENDONER, ANITA BOVA, GEORGE DEMKO, MICHAEL MASULA, TOM STANZIANO, STEVE NAMNATH, KYLE WILLINK, AND JOSEPH M. CARIK, INDIVIDUALLY AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

160.   Paragraphs 1 through 159 are incorporated hereunder as though fully set forth at length.

161.   Defendants Genzyme and Mt. Sinai are strictly liable to Plaintiffs as follows:

   a.   for failure to adequately and safely label the diluted dosage of Fabrazyme®;

   b.   for selling and licensing the use of Fabrazyme® at a defective dose;

   c.   for selling Fabrazyme® in a defective dosage and condition being adulterated with glass, rubber and steel particles;

   d.   for selling and licensing the use of Fabrazyme® at a diluted dose when the dose is untested and unreasonably dangerous for its intended use; and

   e.   for failure to give adequate and complete warnings of the known or knowable dangers involved in the use Fabrazyme® at a diluted dose.

162.    By virtue of the strict liability of Defendants, Defendants are liable for the severe injuries and conditions as set forth herein in Count I of Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink, Steve Namnath, Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano, and all others similarly situated.

163.    As a direct and proximate result of the aforesaid injuries, Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink, Steve Namnath, Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano,  and all others similarly situated have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink, Steve Namnath, Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano, individually and on behalf of all others similarly situated, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with costs of suit.

## COUNT IV: BREACH OF WARRANTY

**ANITA HOCHENDONER, ANITA BOVA, JOSEPH M. CARIK, GEORGE DEMKO, MICHAEL MASULA, KYLE WILLINK, STEVE NAMNATH, RICKY LADD, TOM STANZIANO,  DAVID ROBERTS, TOM OLSZEWSKI, LEE DEANGELIS, AMBER BRITTON, AND SHAWN BRITTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

164.    Paragraphs 1 through 163 are incorporated hereunder as though fully set forth at length.

165.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mt. Sinai's breach of express and implied warranties of merchantability or fitness for the use of Fabrazyme®, in the following particulars:

a.   Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product and inconsistent dosing reduces such deposition;

b.   Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

c.   the Defendants failed to adequately, properly, and timely test the diluted dose prior to use;

d.   Fabrazyme®, given at diluted dosage and being adulterated with glass, steel, and rubber particles, is not fit for the ordinary purpose for which it is customarily or foreseeably used;

e.   the Defendants knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

f.   Fabrazyme®, given at diluted dosage and being adulterated, was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

g.   the Defendants knew or should have known that in order to make Fabrazyme® effective for its intended use, they should have provided the drug at the recommended dose;

h.   the Defendants knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, they should have provided warnings on the product to protect users;

i.   the Defendants did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn users;

j.   the Defendants did not disclose to the users of the diluted dosage of Fabrazyme® that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

k.   the Defendants included an incorrect and unapproved product insert because Defendants do not allow physicians to treat patients with the recommended dose for which the insert was intended;

l.   the Defendants knew or should have known that users were relying upon the expertise of the Defendants in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

m.   in expressly and impliedly warranting that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

n.   in expressly and impliedly misrepresenting that a lowered dose of Fabrazyme® was approved for by the FDA and efficacious for use in the

treatment of Fabry disease.

o.   in expressly and impliedly misrepresenting that a lowered dose of Fabrazyme® was approved for by the FDA and efficacious for use in the treatment of Fabry disease.

166.   As a direct and proximate cause of the breach of these expressed or implied warranties, Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink, Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano, Steve Namnath, Ricky Ladd, David Roberts, Thomas Olszewski, Lee DeAngelis, Amber Britton, Shawn Britton, and all others similarly situated suffered severe injuries and conditions as set forth herein in Count I.

167.   As a result of their injuries and conditions, Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink,  Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano, Steve Namnath, Ricky Ladd, David Roberts, Thomas Olszewski, Lee DeAngelis, Amber Britton, Shawn Britton, and all others similarly situated have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink, Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano, Steve Namnath, Ricky Ladd, David Roberts, Thomas Olszewski, Lee DeAngelis, Amber Britton, Shawn Britton, individually and on behalf of all others similarly situated, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with costs of suit.

## COUNT V: VIOLATION OF BAYH-DOLE ACT PROSCRIPTION OF NON-USE OR UNREASONABLE USE OF PUBLICALLY FUNDED INVENTIONS (IMPLIED CAUSE OF ACTION)

**ANITA HOCHENDONER, ANITA BOVA, JOSEPH M. CARIK, GEORGE DEMKO, MICHAEL MASULA, DAVID ROBERTS, TOM STANZIANO, KYLE WILLINK, STEVE NAMNATH, RICKY LADD, TOM OLSZEWSKI, LEE DEANGELIS, AMBER BRITTON, AND SHAWN BRITTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

168.    Paragraphs 1 through 167 are incorporated hereunder as though fully set forth at length.

169.    The injuries sustained by Plaintiffs were due to Defendants Genzyme and Mt. Sinai violating

the Bayh-Dole Act 35 U.S.C. §200, generally and under the following particulars:

a.    in that the Defendants reduced the dose of Fabrazyme® or denied it entirely for Plaintiffs' Fabry disease thereby unreasonably using and engaging in non-use of the publicly-funded invention, U.S. Patent No. 5,356,804;

b.    in that the Defendants instituted the drug ban for some citizens and rationing to other citizens despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to U.S. citizens and at the required dose pursuant to the Bayh-Dole Act's specific prohibition against a contractor's non-use and unreasonable use of publically funded invention under 35 U.S.C. §200;

c.    in that the Defendants failed to require or provide adequate safeguards to prevent or mitigate damages resulting from the unreasonable use and non-use of publicly-funded invention, U.S. Patent No. 5,356,804;

d.    in that the Defendants instituted the rationing and denial of access despite lacking title or other property right to any patent right of non-use or unreasonable use that otherwise may be allowed  under  35 U.S.C. § 271(d)(4);

e.    in that the Defendants willfully barred physicians from administering the prescribed and lawful recommended dose of the invention Fabrazyme®; and

f.    in that the Defendants caused special injuries unique to the protected class created under the language of 35 U.S.C. §200, whereby such injuries directly arise out of the non-use and unreasonable use of the invention because the Plaintiffs have Fabry disease and rely on access to the publicly funded invention, Fabrazyme®, specifically to treat their disease, which is otherwise fatal.

170.   By virtue of the violation of the Bayh-Dole Act, Defendants are liable for the severe injuries and conditions of Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink, Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano, Steve Namnath, Ricky Ladd, David Roberts, Thomas Olszewski, Lee DeAngelis, Amber Britton, Shawn Britton, and all others similarly situated as set forth herein in Count I.

171.   As a result of their injuries and conditions, Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink, Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano, Steve Namnath, Ricky Ladd, David Roberts, Thomas Olszewski, Lee DeAngelis, Amber Britton, Shawn Britton, and all others similarly situated have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiffs Anita Hochendoner, Anita Bova, Kyle Willink, Joseph M. Carik, George Demko, Michael Masula, Tom Stanziano, Steve Namnath, Ricky Ladd, David Roberts, Thomas Olszewski, Lee DeAngelis, Amber Britton, Shawn Britton, individually and on behalf of all others similarly situated, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with costs of suit.

## COUNT VI: PENNSYLVANIA UNFAIR TRADE PRACTICES CONSUMER PROTECTION LAW VIOLATION (73 P.S. §§201-1 - 201-9.2)

**ANITA HOCHENDONER, ANITA BOVA, GEORGE DEMKO, AND MICHAEL MASULA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

172.   Paragraphs 1 through 171 are incorporated hereunder as though fully set forth at length.

173.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mt. Sinai's deceptive acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

a. in failing to inform the Plaintiff that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use;

b. in affirmatively representing that the drug given at diluted dosage and, further, contaminated with glass, rubber and steel particles is approved to successfully treat Fabry disease and Fabry disease patients will benefit from such use;

c. in willfully including an incorrect and unapproved product insert that does not apply to a diluted dosage;

d. in barring physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert; and

e. in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use.

174.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Anita Hochendoner, Anita Bova, George Demko, Michael Masula, and all others similarly situated, as set forth herein in Count I.

175.   As a direct and proximate result of the aforesaid injuries, Anita Hochendoner, Anita Bova, George Demko, Michael Masula, and all others similarly situated, have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiffs Anita Hochendoner, Anita Bova, George Demko, Michael Masula, individually and on behalf of all others similarly situated, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit.

## COUNT VII: NEVADA STATE LAW DECEPTIVE TRADE PRACTICE VIOLATION (NEVADA REVISED STATUTES §§ 598.0903-0990)

**JOSEPH M. CARIK INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

176.   Paragraphs 1 through 175 are incorporated hereunder as though fully set forth at length.

177.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants Genzyme's and Mt. Sinai's deceptive acts or practices regarding the sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

a.   in failing to inform the Plaintiff that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use;

b.   in affirmatively representing that the drug given at diluted dosage and contaminated with glass, rubber and steel particles is approved to successfully treat Fabry disease and Fabry disease patients will benefit from such use;

c.   in willfully including an incorrect and unapproved product insert that does not apply to a diluted dosage;

d.   in barring physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert; and

e.   in expressly or impliedly misrepresenting that the diluted dose and, further that the adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use.

178.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff Joseph M. Carik, and all others similarly situated, as set forth herein in Count I.

179.   As a direct and proximate result of the aforesaid injuries, Joseph M. Carik, and all others similarly situated, have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiff Joseph M. Carik demands judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with punitive damages, and costs of suit.

**COUNT VIII: MICHIGAN STATE LAW DECEPTIVE TRADE PRACTICE
VIOLATION (MICHIGAN COMPILED LAWS § 445.903 _et seq._)**

**THOMAS OLSZEWSKI, RICKY LADD, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI
SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

180.   Paragraphs 1 through 179 are incorporated hereunder as though fully set forth at length.

181.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and
proximately from Defendants Genzyme's  and Mt. Sinai's deceptive acts or practices
regarding the sale and use of the drug, Fabrazyme®, generally, and in the following
particulars:

      a.   in failing to inform the Plaintiff that the dosage given was unapproved and
unauthorized and the possible consequences of such unapproved and unauthorized
use;

      b.   in affirmatively representing that the drug given at diluted dosage and further
contaminated with glass, rubber and steel particles is approved to successfully treat
Fabry disease and Fabry disease patients will benefit from such use;

      c.   in willfully including an incorrect and unapproved product insert  that does not apply
to a diluted dosage;

      d.   in barring physicians from administering the prescribed and lawful recommended
dose of Fabrazyme® in accordance with the indications of the product insert; and

      e.   in expressly or impliedly misrepresenting that the diluted dose and further that the
adulterated Fabrazyme® was in accordance with statutory mandates and efficacious
for use.

182.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and
conditions of Plaintiffs Thomas Olzewski, Ricky Ladd, and all others similarly situated, as
set forth herein in Count I.

183.   As a direct and proximate result of the aforesaid injuries, Thomas Olzewski, Ricky Ladd,
and all others similarly situated, have suffered damages as set forth herein in Count I.

      WHEREFORE, Plaintiff Thomas Olszewski and Ricky Ladd demand judgment against

Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of

New York, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit.

### COUNT IX: DELAWARE UNIFORM CONSUMER FRAUD ACT
### (6 Del. C. § 2511-2526)

**KYLE WILLINK, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

184.    Paragraphs 1 through 183 are incorporated hereunder as though fully set forth at length.

185.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants Genzyme's  and Mt. Sinai's deceptive acts or practices regarding the sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

　　　　a.    in intentionally failing to inform the Plaintiff that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

　　　　b.    in affirmatively representing that the drug given at diluted dosage and further contaminated with glass, rubber and steel particles is approved to successfully treat Fabry disease and Fabry disease patients will benefit from such use, despite having warned European patients of such dangers and recommended full dose treatment;

　　　　c.    in willfully including an incorrect and unapproved product insert  that does not apply to a diluted dosage and restoring full dose treatment to Europeans in compliance with the labeling requirements;

　　　　d.    in intentionally barring physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert; and

　　　　e.    in expressly or impliedly misrepresenting that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use, by including FDA non-compliant labeling with the drug.

186.    By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff Kyle Willink, and all others similarly situated, as set forth herein in Count I.

187.   As a direct and proximate result of the aforesaid injuries, Kyle Willink, and all others similarly situated, have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiff Kyle Willink demands judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit.

## COUNT X: NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT VIOLATION (N.C.G.S. § 75-1.1 *et seq.*)

**DAVID ROBERTS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

188.   Paragraphs 1 through 187 are incorporated hereunder as though fully set forth at length.

189.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants Genzyme's  and Mt. Sinai's deceptive acts or egregious practices

    a.   in intentionally failing to inform the Plaintiff that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

    b.   in affirmatively representing that the drug given at diluted dosage and further contaminated with glass, rubber and steel particles is approved to successfully treat Fabry disease and Fabry disease patients will benefit from such use, despite having warned European patients of such dangers and recommended full dose treatment;

    c.   in willfully including an incorrect and unapproved product insert  that does not apply to a diluted dosage and restoring full dose treatment to Europeans in compliance with the labeling requirements;

    d.   in intentionally barring physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert; and

    e.   in expressly or impliedly misrepresenting that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use, by including FDA non-compliant labeling with the drug.

190.    By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff David Roberts, and all others similarly situated, as set forth herein in Count I.

191.    As a direct and proximate result of the aforesaid injuries, David Roberts, and all others similarly situated, have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiff David Roberts demands judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit.

### COUNT XI: FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT VIOLATION (F.S. § 501.201 *et seq.*)

**TOM STANZIANO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

192.    Paragraphs 1 through 191 are incorporated hereunder as though fully set forth at length.

193.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants Genzyme's  and Mt. Sinai's deceptive acts or practices regarding the sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

   a.    in intentionally failing to inform the Plaintiff that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

   b.    in affirmatively representing that the drug given at diluted dosage and further contaminated with glass, rubber and steel particles is approved to successfully treat Fabry disease and Fabry disease patients will benefit from such use, despite having warned European patients of such dangers and recommended full dose treatment;

   c.    in willfully including an incorrect and unapproved product insert  that does not apply to a diluted dosage and restoring full dose treatment to Europeans in compliance with the labeling requirements;

    d.    in intentionally barring physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert; and

    e.    in expressly or impliedly misrepresenting that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use, by including FDA non-compliant labeling with the drug.

194.    By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff Tom Stanziano, and all others similarly situated, as set forth herein in Count I.

195.    As a direct and proximate result of the aforesaid injuries, Tom Stanziano, and all others similarly situated, have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiff Tom Stanziano demands judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with costs of suit.

## COUNT XII: WASHINGTON UNIFORM DECEPTIVE TRADE PRACTICES ACT VIOLATION (RCW § 19.86.010 *et seq.*)

**AMBER BRITTON AND SHAWN BRITTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

196.    Paragraphs 1 through 195 are incorporated hereunder as though fully set forth at length.

197.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mt. Sinai's deceptive acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

    a.    in intentionally failing to inform the Plaintiff that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

    b.    in affirmatively representing that the drug given at diluted dosage and further contaminated with glass, rubber and steel particles is approved to

successfully treat Fabry disease and Fabry disease patients will benefit from such use, despite having warned European patients of such dangers and recommended full dose treatment;

c.    in willfully including an incorrect and unapproved product insert that does not apply to a diluted dosage and restoring full dose treatment to Europeans in compliance with the labeling requirements;

d.    in intentionally barring physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert; and

e.    in expressly or impliedly misrepresenting that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use, by including FDA non-compliant labeling with the drug.

198. By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Amber Britton, Shawn Britton, and all others similarly situated, as set forth herein in Count I.

199. As a direct and proximate result of the aforesaid injuries, Amber Britton, Shawn Britton, and all others similarly situated, have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiffs Amber Britton and Shawn Britton, individually and on behalf of all others similarly situated, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit.

## COUNT XIII: WASHINGTON PRODUCT LIABILITY ACT VIOLATION
### (R.C.W. § 7.72 *et seq.*)

**AMBER BRITTON AND SHAWN BRITTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

200. Paragraphs 1 through 199 are incorporated hereunder as though fully set forth at length.

201. All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant Genzyme's practices regarding the manufacture, sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

a.     in that the Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;

b.     in that the Defendant failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

c.     in that the Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;

d.     in that the Defendant manufactured and sold defective Fabrazyme® vials contaminated with glass, rubber and steel particles;

e.     in that the Defendant unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physician's prescribing a lawful and approved dose;

f.     in that the Defendants designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

g.     in that the Defendant instructed physicians and patients to use a reduced the dose of Fabrazyme® that was dangerous, sub-efficacious and unapproved;

h.     in that the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i.     in that the Defendant failed to test or require the testing of the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

j.     in that the Defendant failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

k.     in that the Defendant failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

l.     in that the Defendant failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

m.     in that the Defendant failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the possible consequences of such unapproved and unauthorized use;

n.     in that the Defendant affirmatively represented that the drug given at diluted dosage and further contaminated with glass, rubber and steel particles is approved to successfully treat Fabry disease and Fabry disease patients will

benefit from such use;

o.     in that the Defendant expressly or impliedly misrepresented that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use.

p.     in that the Defendant expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at the and inconsistent dosing reduces such deposition;

q.     in that the Defendant expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

r.     in that the Defendant failed to adequately, properly, and timely test the diluted dose prior to use;

s.     in that the Defendant  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

t.     in that the Defendant knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

u.     in that the Defendant  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

v.     in that the Defendant knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the recommended dose;

w.     in that the Defendant  knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

x.     in that the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users;

y.     in that the Defendant did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

z.     in that the Defendant willfully included an incorrect and unapproved product insert  that does not apply to a diluted dosage;

aa.    in that the Defendant knew or should have known that physicians and users were relying upon the expertise of the Defendant in designing, fabricating,

44

manufacture, testing, labeling as well as supplying Fabrazyme®;

bb.   in that the Defendant expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

cc.   in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

202.   By its actions, Defendants are liable for the severe injuries and conditions of Plaintiffs Amber Britton, Shawn Britton, and all others similarly situated, as set forth herein in Count I.

203.   As a direct and proximate result of the aforesaid injuries, Amber Britton, Shawn Britton, and all others similarly situated, have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiffs Amber Britton and Shawn Britton demand judgment against Defendants Genzyme Corporation in an amount in excess of $75,000.00, together with punitive damages, and costs of suit.

### COUNT XIV: MICHIGAN STATE PRODUCT LIABILITY ACT VIOLATION (M.C.L. 600.2946 *et seq.*)

**THOMAS OLSZEWSKI AND RICKY LADD, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

204.   Paragraphs 1 through 203 are incorporated hereunder as though fully set forth at length.

205.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant Genzyme's  practices regarding the manufacture, sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

a.   in that the Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;

b.   in that the Defendant failed to take reasonable steps to maintain inventories and production capital sufficient to mitigate foreseeable manufacturing shortages;

c.   in that the Defendant failed to take reasonable steps to avoid and prevent

45

contamination of Fabrazyme® vials with particulate steel, glass and rubber;

d.      in that the Defendant manufactured and sold defective Fabrazyme® vials at a diluted dose and contaminated with glass, rubber and steel particles;

e.      in that the Defendant unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise diluted the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physician's prescribing a lawful and approved dose;

f.      in that the Defendants designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory  duty to ensure that Fabrazyme® was made available to all U.S. citizens and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

g.      in that the Defendant instructed physicians and patients to use a diluted the dose of Fabrazyme® that was dangerous, sub-efficacious and unapproved;

h.      in that the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i.      in that the Defendant failed to test or require the testing of the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

j.      in that the Defendant failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

k.      in that the Defendant failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

l.      in that the Defendant failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

m.     in that the Defendant failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the possible consequences of such unapproved and unauthorized use;

n.      in that the Defendant affirmatively represented that the drug given at diluted dosage and further contaminated with glass, rubber and steel particles is approved to successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o.      in that the Defendant expressly or impliedly misrepresented that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use.

p.      in that the Defendant expressly warranted in the Fabrazyme® product insert

that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at the lowered and inconsistent dosing reduces such deposition;

q.      in that the Defendant expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

r.      in that the Defendant failed to adequately, properly, and timely test the diluted dose prior to use;

s.      in that the Defendant manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

t.      in that the Defendant knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

u.      in that the Defendant manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

v.      in that the Defendant knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the recommended dose;

w.      in that the Defendant knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

x.      in that the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users;

y.      in that the Defendant did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

z.      in that the Defendant willfully included an incorrect and unapproved product insert that does not apply to a diluted dosage;

aa.     in that the Defendant knew or should have known that physicians and users were relying upon the expertise of the Defendant in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

bb.     in that the Defendant expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

cc.     in otherwise failing to exercise the care and caution that a reasonable, careful

and prudent entity would have or should have exercised under the circumstances.

206. By its actions, Defendants are liable for the severe injuries and conditions of Plaintiff Thomas Olszewski, Ricky Ladd, and all others similarly situated, as set forth herein in Count I.

207. As a direct and proximate result of the aforesaid injuries, Thomas Olszewski, Ricky Ladd, and all others similarly situated have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiffs Thomas Olszewski and Ricky Ladd demand judgment against Defendants Genzyme Corporation in an amount in excess of $75,000.00, together with punitive damages, and costs of suit.

## COUNT XV: CALIFORNIA BUSINESS AND PROFESSIONAL CODE VIOLATION (CAL. BPC CODE § 17200 *et seq*.)

**STEVE NAMNATH, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

208. Paragraphs 1 through 207 are incorporated hereunder as though fully set forth at length.

209. All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mt. Sinai's unfair trade acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

   a.   in failing to inform the Plaintiff that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use;

   b.   in affirmatively representing that the drug given at diluted dosage and, further, contaminated with glass, rubber and steel particles is approved to successfully treat Fabry disease and Fabry disease patients will benefit from such use;

   c.   in willfully including an incorrect and unapproved product insert that does not apply to a diluted dosage;

   d.   in barring physicians from administering the prescribed and lawful

48

recommended dose of Fabrazyme® in accordance with the indications of the product insert; and

e.   in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use.

210.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Steve Namnath, and all others similarly situated, as set forth herein in Count I.

211.   As a direct and proximate result of the aforesaid injuries, Steve Namnath, and all others similarly situated, have suffered injuries as set forth herein in Count I.

WHEREFORE, Plaintiff Steve Namnath, individually and on behalf of all others similarly situated, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with costs of costs of suit as well as an award of such other and further legal or equitable relief this court deems just and proper.

### COUNT XVI: NEW JERSEY PRODUCT LIABILITY ACT VIOLATION (N.J.S.A.2A:58C-1 et seq.)

**LEE DEANGELIS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

212.   Paragraphs 1 through 211 are incorporated hereunder as though fully set forth at length.

213.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant Genzyme's  practices regarding the manufacture, sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

a.   in that the Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;

b.   in that the Defendant failed to take reasonable steps to maintain inventories and production capital sufficient to mitigate foreseeable manufacturing shortages;

c.      in that the Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;

d.      in that the Defendant manufactured and sold defective Fabrazyme® vials at a diluted dose and contaminated with glass, rubber and steel particles;

e.      in that the Defendant unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise diluted the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physician's prescribing a lawful and approved dose;

f.      in that the Defendant designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

g.      in that the Defendant instructed physicians and patients to use a diluted the dose of Fabrazyme® that was dangerous, sub-efficacious and unapproved;

h.      in that the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i.      in that the Defendant failed to test or require the testing of the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

j.      in that the Defendant failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

k.      in that the Defendant failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

l.      in that the Defendant failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

m.      in that the Defendant failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the possible consequences of such unapproved and unauthorized use;

n.      in that the Defendant affirmatively represented that the drug given at diluted dosage and further contaminated with glass, rubber and steel particles is approved to successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o.      in that the Defendant expressly or impliedly misrepresented that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use.

p.     in that the Defendant expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at the lowered and inconsistent dosing reduces such deposition;

q.     in that the Defendant expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

r.     in that the Defendant failed to adequately, properly, and timely test the diluted dose prior to use;

s.     in that the Defendant manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

t.     in that the Defendant knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

u.     in that the Defendant manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

v.     in that the Defendant knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the recommended dose;

w.     in that the Defendant knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

x.     in that the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users;

y.     in that the Defendant did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

z.     in that the Defendant willfully included an incorrect and unapproved product insert that does not apply to a diluted dosage;

aa.     in that the Defendant knew or should have known that physicians and users were relying upon the expertise of the Defendant in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

bb.     in that the Defendant expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

cc.   in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

214.   By its actions, Defendants are liable for the severe injuries and conditions of Plaintiff Lee DeAngelis, and all others similarly situated, as set forth herein in Count I.

215.   As a direct and proximate result of the aforesaid injuries, Lee DeAngelis, and all others similarly situated have suffered damages as set forth herein in Count I.

WHEREFORE, Plaintiff Lee DeAngelis demands judgment against Defendants Genzyme Corporation in an amount in excess of $75,000.00, together with punitive damages, and costs of suit.

## COUNT XVII: BREACH OF THIRD PARTY BENEFICIARY CONTRACT UNDER NEW YORK LAW

**ANITA HOCHENDONER, ANITA BOVA, JOSEPH M. CARIK, GEORGE DEMKO, MICHAEL MASULA, KYLE WILLINK, STEVE NAMNATH, RICKY LADD, TOM STANZIANO, DAVID ROBERTS, TOM OLSZEWSKI, LEE DEANGELIS, AMBER BRITTON, AND SHAWN BRITTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

216.   Paragraphs 1 through 215 are incorporated hereunder as though fully set forth at length.

217.   The contract entered into between Genzyme and Mt. Sinai expressly provides on its face that Fabry patients are the intended beneficiaries of the contract.  See Exhibit A to Defendants' Motion to Dismiss (Document 22-1 Filed 05/12/11 Page 2 of 20)

218.   The contract entered into between Genzyme and Mt. Sinai expressly states that Mt. Sinai licenses U.S. Patent No. 5,356,804 to Genzyme "to have recombinant x-galactosidase A developed and made available for **general** use to patients for the treatment of Fabry Disease and for these purposes is willing to grant an exclusive license to GENZYME upon the terms and conditions set forth below." (emphasis added).  *Id.*

219.   Genzyme has breached the contract with Mt. Sinai by failing to make recombinant x-

52

galactosidase A available for **general** use to patients by restricting access of patients to the Fabrazyme® for two years, as of this filing.

220.   The breach has led to patients being untreated or improperly treated for Fabry disease, with Genzyme's full knowledge of this consequence.

221.   It would have been reasonably foreseeable by Genzyme that third party beneficiary Fabry patients would be significantly harmed by the breach.

222.   As a proximate result of Genzyme's breach of contract, third party beneficiary Fabry patients have suffered damages and losses.

223.   As a proximate result of the breach of contract by Genzyme, third party beneficiary Fabry patients will continue to suffer damages and losses.

224.   As a direct and proximate result of the negligence of Defendants, the Plaintiffs have sustained or are at imminent risk of sustaining the following serious injuries, some or all which may be of a permanent nature:

   a.   renal injury;
   b.   cardiac injury;
   c.   neurological injury;
   d.   peripheral pain;
   e.   chronic abdominal pain and diarrhea;
   f.   impairment of vision;
   g.   impairment of hearing;
   h.   increased severity and likelihood of infusion reactions, and
   i.   premature death and other serious and permanent injuries.

225.   As a direct and proximate result of the aforesaid injuries, Plaintiffs have been damaged as follows:

   a.   Plaintiffs have been and will be required to expend large sums of money for medical and surgical attention, medical and surgical supplies, medical and

53

surgical appliances, and medicines;

b.   Plaintiffs have suffered and will continue to suffer great pain, suffering, inconvenience, impairment of bodily function, and mental anguish;

c.   Plaintiffs have been and will be deprived of earnings and earning capacity;

d.   Plaintiffs have suffered loss of enjoyment of life;

e.   Plaintiffs have died or suffered a reduced life expectancy; and

f.   Plaintiffs' general health, strength and vitality have been impaired.

WHEREFORE, Plaintiffs Anita Hochendoner, Anita Bova, Joseph M. Carik, George Demko, Michael Masula, David Roberts, Kyle Willink, Tom Stanziano, Ricky Ladd, Steve Namnath, Thomas Olszewski, Lee DeAngelis, Amber Britton, and Shawn Britton, individually and on behalf of all others similarly situated, demand judgment against Defendants, Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally for damages caused by the contractual breach, for consequential and incidental damages and for and award of prejudgment interest in an amount in excess of $75,000.00, together with costs of suit as well as an award of such other and further legal or equitable relief this court deems just and proper.

## COUNT XVIII: LOSS OF CONSORTIUM

**BARBARA J. CARIK, EARL HOCHENDONER, CHERYL BRITTON, ERIN MASULA, WENDY STANZIANO, STACY LADD, KATHY DEANGELIS, HEIDI WITTENBERG AND DARLENE COOKINGHAM, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE OF THE CITY UNIVERSITY OF NEW YORK**

226.   Paragraphs 1 through 225 of the Complaint are incorporated as if set forth fully at length herein.

227.   As a direct and proximate result of the injuries sustained by their spouses, Plaintiffs have been damaged as follows:

a.   Plaintiffs have been and will continue to be compelled to expend large sums of money for medical care, supplies, appliances, and medicine;

      b.     Plaintiffs have been and may be compelled to expend large sums of money for hiring help to perform household duties previously performed by their spouses; and

      c.     Plaintiffs have been and will be deprived of their spouse's aid, comfort, assistance, companionship, and consortium.

WHEREFORE, Plaintiffs Barbara J. Carik, Earl Hochendoner, Cheryl Britton, Erin Masula, Stacy Ladd, Wendy Stanziano, Kathy DeAngelis, Heidi Wittenberg, and Darlene Cookingham, individually and on behalf of all others similarly situated, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine of the City University of New York, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit.

**<u>PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.</u>**

Respectfully submitted,


  */s/ Matthew L. Kurzweg*
Matthew L. Kurzweg, Esq. (admitted *pro hac vice*)
Kurzweg Law Offices
945 Liberty Avenue
5th Floor Bruno Building
Pittsburgh, PA  15222
(412) 258-2223
mkurzweg@kurzweglaw.com


C. Allen Black, Jr., Esq. (admitted *pro hac vice*)
Law Office of C. Allen Black, Jr.
1579 Montgomery Rd.
Allison Park, PA 15101
412-908-3268
allen@patentlawyersite.com


Anthony R. Zelle, BBO #548141
Suzanne M. Young, BBO #675399
Zelle, McDonough & Cohen, LLP
101 Federal Street, 14th Floor
Boston, MA 02110
(617) 742-6520 ext. 219
(617) 742-1393 (fax)
tzelle@zelmcd.com


Dated: June 30, 2011


## CERTIFICATE OF SERVICE

I, Anthony R. Zelle, counsel for Plaintiffs, hereby certify that I have caused to be served a true and correct copy of the foregoing Second Amended Complaint upon the all counsel of record by of the Court's CM/ECF filing system this 30th day of June, 2011,

  */s/ Anthony R. Zelle*
Anthony R. Zelle, BBO #548141