```
1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3    PHILIP ADAMO, ET AL,            )
                                     )
4                  Plaintiffs        )
                                     )
5                                    )  No. 1:13-cv-11336-DPW
     vs.                             )
6                                    )
                                     )
7    GENZYME CORPORATION,            )
                                     )
8                  Defendant.        )
     _____)
9                                    )
     ANITA HOCHENDONER, ET AL.,      )
10                                   )
             Plaintiffs              )  No. 1:11-cv-10739-DPW
11                                   )
     vs.                             )
12                                   )
     GENZYME CORPORATION,            )
13                                   )
                   Defendant.        )
14                                   )
```

15   BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

16

17                         MOTION HEARING

18

19            John Joseph Moakley United States Courthouse
                         Courtroom No. 1
20                       One Courthouse Way
                         Boston, MA 02210
21                       January 15, 2014
                            8:55 a.m.

22

23            Brenda K. Hancock, RMR, CRR
                  Official Court Reporter
24       John Joseph Moakley United States Courthouse
                     One Courthouse Way
25                   Boston, MA 02210
                      (617)439-3214

1    APPEARANCES:

2

     ON BEHALF OF THE PLAINTIFFS:

3

          ZELLE MCDONOUGH & COHEN LLP
4         By:  Anthony R. Zelle, Esq.
          101 Federal Street
5         Boston, MA 02110

6         THE LAW OFFICE OF C. ALLEN BLACK, JR.
          By:  C. Allen Black , Jr., Esq.
7         1579 Montgomery Rd.
          Allison Park, PA 15101

8

9         KURZWEG LAW OFFICES
          By: Matthew L. Kurzweg, Esq.
10        945 Liberty Avenue
          5th Floor Bruno Building
11        Pittsburgh, PA 15222

12

     ON BEHALF OF THE DEFENDANT:

13

14        ROPES & GRAY - MA
          By: Catherine A. Mondell, Esq.
15        Prudential Tower
          800 Boylston Street

16

17        EF EDUCATION FIRST
          By: William J. Dunn, Esq.
18        8 Education Street
          Cambridge, MA 02141

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2     before the Honorable Douglas P. Woodlock, United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6     January 15, 2014):

7          THE CLERK:  All rise.

8       (The Honorable Court entered the courtroom at 8:55 a.m.)

9          THE CLERK:  This Honorable Court is now in session.

10    You may be seated.

11         This is Civil Action No. 13-11336, Phillip Adamo

12    versus Genzyme Corporation, et al.

13         Will counsel please identify themselves for the

14    record.

15         MR. KURZWEG:  Yes.  For the plaintiff, Matthew

16    Kurzweg.

17         MR. BLACK:  For the plaintiff, Allen Black.

18         MR. ZELLE:  Tony Zelle, your Honor.

19         MS. MONDELL:  For defendant, Catherine Mondell.

20         MR. DUNN:  And William Dunn also for the defendant.

21         THE COURT:  Let me start with the allegations of

22    injury to the named plaintiffs here.

23         What specific injuries do we have for the named

24    plaintiffs, Mr. Kurzweg?

25         MR. KURZWEG:  Your Honor, I would refer the Court to

1    Paragraphs 246, 247 and 248 in the Amended Complaint.

2              THE COURT:  Which one?  This is the Hochendoner --

3              MR. KURZWEG:  In Adamo, and I understand they have

4    been consolidated.

5              THE COURT:  Right.  I am just trying to figure out

6    what -- 246?

7              MR. KURZWEG:  I'm sorry.  247 lists the injuries that

8    are associated with the deterioration Fabry Disease.

9              THE COURT:  Perhaps I am pulling out the wrong

10   complaint.  We are talking about the Second Amended Complaint.

11             MR. KURZWEG:  I'm sorry.  It's the Amended Complaint

12   in Adamo.

13             THE COURT:  So, 246.  Which one of these people

14   suffered an injury?

15             MR. KURZWEG:  Well, your Honor, all of them.  All of

16   them.

17             THE COURT:  Well, where does it say that all of them

18   did, except in this generalized sort of allegation?  Which one

19   of them consumed Fabrazyme that was contaminated with fibrous

20   glass, rubber and seal particles?

21             MR. KURZWEG:  Well, we haven't pled specifically which

22   particular plaintiff.

23             THE COURT:  But you have to.  You have got to identify

24   what the plaintiff's injury is.  Judge Howell could not have

25   been clearer about this, about the standing dimension to it.

1    You do not know whether or not they have suffered any injury;

2    you just say there are potential for injury out there, and

3    these are people who had some interest in receiving Fabrazyme.

4    That is the essence of the allegation, isn't it?

5         MR. KURZWEG:  The essence of the allegation is that

6    all of the plaintiffs sustained some harm and some injury as a

7    result of being deprived of a full dose that was not

8    FDA-approved.

9         THE COURT:  Let us start with Mr. Adamo.  What did he

10   suffer?

11        MR. BLACK:  Your Honor, Allen Black.  He has actually

12   had bone deterioration.

13        THE COURT:  Well, we are looking at causation.  Bone

14   deterioration can be caused by a variety of different things.

15   Where do I see in this complaint that there is something that

16   is directly related to the Fabrazyme in some fashion?  You have

17   got this, not to be too arch about it, dog's breakfast of

18   allegations with respect to problems with Fabrazyme, but you do

19   not tie them to the individual plaintiffs.

20        MR. KURZWEG:  I think we do, your Honor.  I think in

21   Paragraphs 207 and 208 of the complaint we talk about --

22        THE COURT:  This is 207 of the Adamo complaint?

23        MR. KURZWEG:  Of the Adamo amended complaint, right.

24   We talk about -- first of all we lay the predicate for the

25   shortage, and talk about the reduced dosage, and then we bring

1    it together and say, as a direct result of the manufacturing

2    disruptions Genzyme forced U.S. patients but not Europeans to

3    miss doses which resulted in an increased risk in severity of

4    acute adverse reactions due to inconsistent --

5            THE COURT:  We will start with "increased risk."  That

6    does not mean anything at all.

7            MR. KURZWEG:  Okay.

8            THE COURT:  Now we talk about "severity of acute

9    adverse reactions."  What did Mr. Adamo suffer on that ground?

10           MR. KURZWEG:  We have alleged that all of the

11   plaintiffs have suffered.

12           THE COURT:  So, there is no specific allegation with

13   respect to Mr. Adamo?

14           MR. KURZWEG:  He is covered by the allegations that we

15   have made in regard to all other plaintiffs.

16           THE COURT:  So, the answer is, "That is right, there

17   is no specific allegation as to Mr. Adamo; he is part of,

18   lumped together with everybody who has ever taken Fabrazyme?"

19           MR. KURZWEG:  Or who received a reduced --

20           THE COURT:  So he received a reduced dosage.  So, that

21   is what he is.  That is the specific allegation with respect to

22   Mr. Adamo?

23           MR. KURZWEG:  In regard to what we need to prove --

24   what we need to plead at this stage under Twombley, Iqbal, et

25   cetera, is that we have to show that the plaintiffs had some

1    injury, and that injury was caused by some breach of duty by

2    Genzyme.  I think that what we say in 207 and 208, that as a

3    result of this reduction they sustained some injuries, and

4    those injuries and, you know, return of symptoms, accelerated

5    disease development, injury, otherwise preventable disease

6    progression, and then we go in 246 and say what those are.

7    When someone doesn't get Fabrazyme, their Fabry disease

8    progresses.  When they get a reduced dosage, according to the

9    complaint --

10            THE COURT:  Just a moment, just a moment.  We are

11   talking about individual plaintiffs; we are not talking about

12   the world of people who were exposed for a period of time to

13   reduced dosages of Fabrazyme.  So, I ask about individual

14   plaintiffs, and I asked what happened to Mr. Adamo with

15   increased risk?  His increased risk is the same as everybody

16   else's increased risk?

17            MR. KURZWEG:  Certainly not.  I would say that each

18   plaintiff has certain symptomatology and certain risks that are

19   different than any other patient.  Everyone is an individual

20   person, and I understand where the Court is going with that

21   question.

22            THE COURT:  Now you say it.  Where do I find it in the

23   complaint?

24            MR. KURZWEG:  You find it in the complaint, because we

25   go through, we identify each individual plaintiff.  We then go

1  forward and cause -- we plead the shortage, we plead the

2  reduced dosage, and then we say that reduced dosage caused

3  these harms to these people.  It is a generalized pleading.

4  That is what it is.

5       And the Court is correct.  I don't say anywhere in the

6  complaint that Mr. Adamo suffered increased bouts of diarrhea,

7  or an enlarged heart, or progression of his renal failure, or

8  anything like that for any particular plaintiff.  But I think

9  that, with the pleading standard the way it is at this point,

10  if I name the plaintiffs and I say, "Here is the problem with

11  the reduced dosage, this is what it causes, and these

12  plaintiffs all suffer some degree of these various injuries,"

13  at this point I think it survives.

14       THE COURT:  Well, we have a somewhat different view

15  about pleading standards.  But I think I am clear on this, that

16  you have not pled anything specific.

17       Now, let us go to Carik, understanding that it is a

18  case against a different kind of defendant.  But if I apply the

19  injury in fact determinations of Judge Howell, you do not even

20  have standing here to raise it.  You do not have -- perhaps I

21  will frame the issue, and then you will respond.

22       You have not indicated here what the increased risk is

23  compared to what.  You have not shown any acute adverse

24  reactions with respect to any of these individuals that are due

25  to inconsistent schedules.  He could not find any injury in

1  fact for the Fabrazyme cases.  He distinguished it from the --

2  is it Aquasol A?  But he could not find any for Fabrazyme, and

3  this seems to be a pattern in pleading by the same lawyers.

4      So, if I were Judge Howell and were presented with

5  this and adhered to Carik, would this survive, and how?

6      MR. KURZWEG:  I think it would, your Honor.  I think

7  that Carik is a very different case.  I mean, Carik was a case

8  that was filed against the FDA.

9      THE COURT:  I understand it is against somebody

10  different, but he identifies the question of injury in fact,

11  and your problem was the lack of injury in fact.  What have you

12  done here that demonstrates injury in fact that would satisfy

13  the analysis -- understanding that it is a different

14  defendant -- the analysis in Carik?

15      MR. KURZWEG:  I think it's the same answer to the

16  first question that the Court raised, which is, we have alleged

17  a rationing plan, an act of misfeasance on behalf of the

18  defendant.  The defendant distributed reduced dosages that

19  weren't FDA-approved.  Plaintiffs took those dosages.  We have

20  alleged the harm that is caused by taking a reduced dosage, and

21  we have alleged the injuries that were caused by those reduced

22  dosages.  We have alleged the duty, we have alleged the breach,

23  and the causation and the damages.

24      So, again, those same paragraphs in both Hochendoner

25  and Adamo control.  In Adamo, again, we allege that, according

1    to EMA studies in Paragraphs 163 to 165, that the diluted dose

2    causes an acceleration of the symptomology of Fabry Disease.

3          THE COURT:  And Judge Howell dealt with all of that.

4    He says mere allegations that there is a possibility that

5    adverse effects may take place from taking a diluted drug is

6    not going to be enough.  He talks about the EMA study, and has

7    an analysis of what seems to be, at best, an ambiguous set of

8    language.  Steady increase in a number of reported adverse

9    events compared to what?  It does not indicate that any of the

10   plaintiffs in that case or this case actually suffered from

11   such adverse effects.

12         MR. KURZWEG:  I think the difference is that we go

13   beyond citing mere EMA studies and mere possibilities of

14   injury, your Honor.  In this particular case we say that these

15   folks suffered an injury as a result of the reduced dosage.

16         THE COURT:  That is what you say.  It is a conclusory

17   allegation, and Iqbal is emblematic of the need to focus and

18   make plausible claims of great generality.  I have got lots of

19   paper, but I look to see whether there is a person who has

20   alleged with particularity that they have suffered from some of

21   this harm, and it is not as if there has not been a little bit

22   of time to identify that, and it is not as if these people are

23   not in your control.  They are your clients.  And what you have

24   done is what was done in Carik, generalized claims which Judge

25   Howell found insufficient to demonstrate injury in fact.

1          And I go back to the question, if I were Judge Howell

2     faced with this, these two complaints, and I wanted to be

3     consistent, how could I let these two complaints go forward?

4          MR. KURZWEG:  I think that, again, your Honor, what we

5     are talking about is enough to get past Iqbal, is to --

6          THE COURT:  Answer my question.  Do not simply invoke

7     the idea that you think Iqbal does not stand for what I think

8     it stands for.  Answer it specifically.

9          I asked you, if this were presented to Judge Howell,

10    how could he not dismiss on the basis of the analysis he

11    provided in Carik?

12         MR. BLACK:  Your Honor, I represent Mr. Carik in the

13    case, and --

14         THE COURT:  Is it on appeal?

15         MR. BLACK:  Sorry?

16         THE COURT:  Is it on appeal?

17         MR. BLACK:  It will be, your Honor.

18         THE COURT:  "Will be"?  Why isn't it by now?

19         MR. BLACK:  Sixty days when the Government is a party,

20    your Honor.

21         THE COURT:  All right.

22         MR. BLACK:  The standard for a dismissal for lack of

23    standing on the pleadings is -- and this is according to

24    Lujan -- at the pleading stage general factual allegations of

25    injury resulting from the defendant's conduct may suffice, for

1   on a Motion to Dismiss we presume that general allegations

2   embrace those specific facts that are necessary to support the

3   claim.

4           THE COURT:  So, let me just pause, because at some

5   point one or the other of you will either answer my question or

6   tell me, "I cannot answer your question."

7           MR. BLACK:  Yes, your Honor.

8           THE COURT:  So, let me get to the point.  Judge Howell

9   analyzed Lujan.  I take it your argument is Judge Howell got it

10  all wrong, right?  That is an argument.  Maybe I will listen to

11  it at some length, but I want to understand now how this case

12  is different from what Judge Howell decided in Carik after

13  going through Lujan and understanding the ability that we all

14  have to cherry-pick language out of cases that precede it,

15  Iqbal, on generalized pleadings.

16          MR. BLACK:  Yes, your Honor.  And the injury is

17  progression of Fabry Disease.  It is a clinically recognized

18  state.  It is objectively verifiable.  It is measured by

19  different standards.  It could be measured by globo ceramide

20  levels.

21          THE COURT:  Can one of you answer my question or not?

22  Just answer the question.  It is a simple question.  If this

23  were presented to Judge Howell with the analysis that is given

24  in Carik, would these two complaints survive, and why, apart

25  from "He is wrong and we are going to get him tipped over by

1    the DC Circuit.

2           MR. KURZWEG:  So, apart from he is wrong and we may

3    appeal, we think that -- again, I understand the Court's point

4    there are no specific allegations saying Mr. Adamo suffered

5    renal failure, but I think that in a products liability

6    personal injury case like this one, which is different than a

7    Constitutional FDA case, that when you make the pleading that

8    says, "Here is the reduced dosage, the reduced dosage causes

9    harm and has caused harm to these individuals, and here are the

10    symptomatologies that are increased or accelerated by the

11    reduced dosage," that's very different than finding standing in

12    an FDA Constitutional case.

13           So, I think that's the distinction, and that is our

14    answer to your question.

15           THE COURT:  Well, if that is the answer, that is the

16    answer.  It is not a complete answer to the question.

17           So, I must tell you, I look at injury in fact the way

18    Judge Howell did, and I am asking myself where I can find that

19    these generalized claims apply to individual defendants here,

20    and I do not believe I can.  I do not believe, looking at this,

21    that I can.  Now, there are themes and variations that you have

22    presented with respect to this, but they all come down to the

23    same thing.  You say, "Well, it is a products liability case;

24    it is not a challenge to administrative action."  I suppose

25    that is right, but the analysis amounts to the same thing.

1          If I have to look at the product here, one way I could

2     look at the product is say they got adulterated product, they

3     were putting it out on the market.  That is the kind of thing

4     that is products liability, except none of these people have

5     suffered from anything.  None of them say that, "I took it, I

6     took this adulterated product."  None of them say, "I was

7     injured as a result of this adulterated product."  I would

8     require that in a basic products liability case with one

9     individual, and it does not get better by aggregating a bunch

10    of individuals, none of whom can say they have suffered a

11    particular harm, except to say there are harms out there, and

12    these are people who took it and, therefore, there is a

13    connection.  There is not.  There has to be a causation

14    connection, and I do not see it anywhere alleged.

15         So, I guess I am at a loss to see why you have not

16    simply stumbled at the threshold of your pleadings under that

17    analysis.

18         MR. KURZWEG:  Well, your Honor, I think that we have

19    pled the requisite elements of the fact that they have taken it

20    and causation in 208 and 209.  The irony here is that in this

21    what amounts to a personal injury action we have alleged that

22    they have suffered these injuries, and the irony is that

23    Genzyme knows that.  I mean, they have collected data on these

24    people, as we have alleged in the complaint.

25         THE COURT:  And they should have pled it for you?

1          MR. KURZWEG:  No, I'm not saying they should have pled

2     it for us.

3          THE COURT:  You should plead the injury to the

4     individuals.  You say there is injury to the individuals.

5     Okay.  Where is it?  It is not pled.  I have got a bunch of

6     individuals and I have got allegations of generalized harm, and

7     the connection between them is missing.  Is there some other

8     aspect of this that I should be looking at to understand your

9     complaint, or are you rising and falling on your view of how

10    you can get away with alleging generalized harm for particular

11    individuals?

12         MR. KURZWEG:  Well, I think that what I have said so

13    far is our position with regard to the current pleading status.

14    I think that, as the Court has intimated, that we are within

15    possession of this particular information, and certainly we can

16    plead the exact harm for each particular plaintiff.

17         THE COURT:  Oh, now, wait a minute.  We had a

18    discussion about whether or not this was your best complaint.

19    I was very clear about that.

20         MR. KURZWEG:  That was before they were consolidated,

21    your Honor.

22         THE COURT:  No, you do not get away with -- this is

23    not kind of "Whack-a-Mole."  I gave you an opportunity, and you

24    have had an extended opportunity, to draft a complaint that is

25    compliant.  You were aware of the analysis of Judge Howell in

1    Carik before this hearing.  You did not ask me for additional

2    time.  No.  This is the complaint you rise and fall on.  This

3    is the one that you decided to move forward on, set of

4    complaints that you decided to move forward on.  So, we are not

5    talking about amending complaints now.  We are talking about

6    whether or not your last and best offer survives.

7         So, is there anything, any other of these claims that

8    somehow I should look at differently?

9         MR. KURZWEG:  I can simply point out the paragraphs

10   again that we think that we have alleged to allege the

11   causation elements and the harm elements, and they are -- in

12   the Hochendoner case we talk about the causation of the reduced

13   dosage causing harm to the plaintiffs in Paragraphs 124 and

14   125.  We talk about the causation with the injuries that were

15   caused by the reduced dosages in Paragraphs 154 and 155.  In

16   Adamo we talk about the causation of the reduced dosage causing

17   harm in 207 and 208.  We talk about the injuries that were

18   caused in 247 and 248.

19        Again, we respectfully understand the Court's position

20   in regard to the generality issue.  We think that this case is

21   distinguishable for the reasons that we talked about from Judge

22   Howell's decision in Carik because of the fact that it is a

23   personal injury case, and because of the fact that we have

24   alleged injury, we have alleged causation, we have alleged

25   everything we need to allege at this point under Iqbal.

1          We have nudged this claim across the line into a

2    plausible cause of action, your Honor.  I think that, to the

3    extent that there are medical issues, specific causation issues

4    with specific plaintiffs and specific injuries, certainly

5    discovery allows for the production of all of that information.

6    Moreover, one of the points of --

7          THE COURT:  The discovery from whom?  Who are the

8    people who are injured?  Your clients.

9          MR. KURZWEG:  Right.

10          THE COURT:  So, you are going to discover from your --

11    you bring the lawsuit and then you discover from your clients

12    what their actual injuries are?  I understand, or perhaps you

13    do, the reverse English involved in that.

14          We have that threshold problem.  None of the other

15    claims go beyond that threshold problem, if it is a problem.

16    Is that right?  I want to be sure I have not missed something

17    here.  There is a rather extensive set of allegations, but none

18    of them seem to me to be immune from the attack of the lack of

19    allegation of injury in fact to a specific plaintiff.

20          MR. BLACK:  Your Honor, may I add, there is one

21    plaintiff, Mr. Mooney.

22          THE COURT:  Mr.?

23          MR. BLACK:  Mooney.

24          THE COURT:  I am sorry.  Which one is he in?  Is he in

25    Adamo?

1          MR. BLACK:  Adamo, yes, your Honor.  And we pled with

2     particularity to sensitization.  He is no longer able to take

3     Fabrazyme.  His disease is progressing untreated because of

4     life-threatening --

5          THE COURT:  Let me look at the allegations so I am

6     sure I have got them right.  Where are the allegations about

7     Mr. Mooney?  This is James Mooney?

8          MR. BLACK:  James Mooney.

9          THE COURT:  And Laura Kurtz-Mooney is his wife?

10         MR. BLACK:  His wife, yes, your Honor.

11         THE COURT:  So, where are the particular allegations

12    regarding Mr. Mooney?

13         MR. BLACK:  It is Paragraph 58, your Honor.  "He

14    experienced anaphylactic treatment reactions from the

15    development of antibodies to the diluted Fabrazyme."

16         THE COURT:  Let me look at it directly.

17                        (Pause)

18         THE COURT:  So, with respect to Mr. Mooney, the

19    allegation is that, being deprived of the full dose, he was

20    then exposed to continued onset of the disease or continued

21    progress of the disease, and, consequently now he cannot be --

22    well, it is unknown whether he can be treated with Fabrazyme

23    again.  Is that the gist of it?

24         MR. BLACK:  Yes, your Honor.  He developed --

25         THE COURT:  So, let me just ask this question:  If

1      there were no Fabrazyme available, it would have been the same

2      outcome, right?

3              MR. BLACK:  No, your Honor.  Antibodies only arise

4      when you are exposed to a particular antigen, for example, an

5      allergen.  So, exposure to the protein necessarily causes

6      sensitization.

7              THE COURT:  Where do I find that alleged?

8              MR. BLACK:  Your Honor, that's inherent to the term

9      "anaphylactic."

10             THE COURT:  So, this is inherent pleading?

11             MR. BLACK:  No, your Honor.  "Anaphylaxis," by

12     definition, clinically means exposure to a prior antigen, and

13     the memory T cells respond to that antigen, so it necessarily

14     is defined that way.

15             THE COURT:  So, I should look more carefully at

16     Paragraph 58 for Mr. Mooney.  He is one person for whom

17     something more specific is alleged; is that right?

18             MR. BLACK:  Yes, your Honor.

19             THE COURT:  Is there anybody else?

20             MR. BLACK:  All of the patients paid for the diluted

21     dose, your Honor, so pecuniary injury has occurred.  They,

22     presumably, would get their money back.

23             THE COURT:  Why?

24             MR. BLACK:  Oh, your Honor, they didn't consent to

25     receiving the diluted dose.  They were given it unilaterally.

1          THE COURT:  Of course they consented to taking it.

2     Did somebody tie them down and --

3          MR. BLACK:  Yes, your Honor.  They were told that --

4          THE COURT:  No.  Did someone tie them down and

5     administer it?  That is an arch question.  Of course not.  So,

6     you say they were forced to take it because they had no other

7     choice; is that it?

8          MR. BLACK:  Yes, your Honor.

9          THE COURT:  They had other choices.  The choice was

10    not to take it at all.  So, they took it with a recognition

11    that the FDA package insert said that this was not an approved

12    dose, and the question that I have, am going to have for the

13    defendants, is how I say that with someone like Mr. Mooney, or

14    anyone who could be particularized with Mr. Mooney, that the

15    withdrawal of full amounts did not accelerate the disease?

16         Now, you say that they lost money on it.  They only

17    lost money if they did not get what they thought they were

18    getting, and what they thought they were getting was something

19    other than the authorized amount.  There are no allegations

20    here of anything other than that.  It certainly was not argued.

21         MR. KURZWEG:  We do allege that, when they reduced the

22    dosage and they distributed it, that they knew that it was

23    harmful.

24         THE COURT:  No, no.  We are talking about the

25    suggestion here is that these people were coerced into doing

1   it.

2           MR. KURZWEG:  Well, it was coerced in the sense that

3   they were -- if they decided not to take the dose they would be

4   put at the end of the line for resumption of full dosages

5   pursuant to the plan.

6           THE COURT:  That does not make any difference if the

7   outcome is not harm.  They made a choice.

8           MR. KURZWEG:  But we have pled that.

9           THE COURT:  But we are back to where we were before.

10  Now the suggestion is that it is somehow a case about

11  misbranding.

12          So, let me understand from the defendants and focus on

13  the specific allegation in Paragraph 58 in Adamo regarding

14  Mr. Mooney.

15          But one thing I want to be clear on and see whether

16  there is any dispute, in Judge Howell's decision he indicates

17  that the reduced dosage levels persisted until early 2012.

18  That, at least, is what he says on Page 3 of the Westlaw

19  printout that I have.  Then, on the next page, he says in the

20  discussion of the Bayh-Dole March-In Petition that it was over

21  in early 2013.

22          Which one is it?  When was it over?  Is it over?

23          MS. MONDELL:  Early 2012, your Honor.

24          THE COURT:  So, what is he talking about when he says

25  "2013"?

1          MS. MONDELL:  Your Honor --

2          THE COURT:  It is at the end of the first paragraph of

3    the Section (C)(1) dealing with Bayh-Dole.

4          MS. MONDELL:  Your Honor, I believe that the reference

5    there is to the NIH's final determination.  There was a

6    March-In Petition that was --

7          THE COURT:  Right, but it is more than that.  They

8    closed the March-In Decision in February 2013.  They say by

9    early 2013 the drug shortage was over.  I suppose one would not

10   be inconsistent but probably imprecise by saying that, since it

11   was over in 2012, it is certainly over by 2013.  But that

12   anomaly appears here.  I want to understand what that means, if

13   anything.

14         MS. MONDELL:  To my reading, your Honor, it is the

15   concept that the shortage was over in early 2012.  I don't

16   believe that plaintiffs here contest that timing.

17         THE COURT:  Let me be clear.  Is there any dispute

18   about that, that the question of a drug shortage is over by

19   2012, early 2012?

20         MR. KURZWEG:  I believe -- is it March of 2012?

21         THE COURT:  March 1, yes.

22         MR. KURZWEG:  There is no dispute that everyone is

23   receiving a full dose, who wants one, as of that date.

24         THE COURT:  All right.

25         So, let's go to Mr. Mooney here.  The allegation is

1    that the various plaintiffs, including Mr. Mooney, were given a

2    "put up or shut up" opportunity here.  Either you take the

3    partial dose or you end up at the end of the line.  That is the

4    allegation.  That seems fairly clear.  So, faced with that

5    choice, Mr. Mooney apparently undertook to continue -- well, it

6    is not clear what he did, frankly, before March 2012.  It says

7    that since June 2009 he has been forced to be injected by

8    non-FDA-approved dosages.  So, apparently he decided to take

9    the dosages.  Then they say that, with a degree of what I will

10   refer to as "inherent pleading," he experienced anaphylactic

11   treatment reactions when he went back on.

12         Now, the administration of the partial dosages can be

13   read here to have led to a condition when the full dosages were

14   thereafter resumed that was harmful to him.  So, what do I say

15   or what do you say about the specificity of that pleading?

16         MS. MONDELL:  Well, your Honor, it gets closer to the

17   mark, certainly, than others, but I think that there is a lack

18   of particularity in terms of tying what is alleged in this

19   paragraph to harms that are alleged in other paragraphs that

20   plaintiffs have pointed to.

21         THE COURT:  This is a fulsome set of pleadings, to be

22   sure.  I can concur in this case with what Judge Howell said in

23   Carik, that it tends to obfuscate the relevant facts of the

24   matter, mixes facts, legal arguments and political and social

25   theory often in the same paragraph.

1          But we have Paragraph 58, which makes an allegation

2     that, as a result of the dosing alternatives provided to

3     Mr. Mooney, that he suffered from an anaphylactic treatment

4     reaction and cannot be treated anymore.

5          Now, why isn't that enough to allege personal injury

6     to Mr. Mooney, whether believed or not?

7          MS. MONDELL:  Your Honor, I think it does require a

8     degree of extrapolation from the -- I think we are calling it

9     "inherent pleading."

10          THE COURT:  Well, but what else can I say here?  It is

11     not merely *post hoc ergo propter hoc*, that is, after something

12     happened it is because something happened.  It is a little more

13     specific than that.  It says that he experienced this

14     anaphylactic treatment as a result of the diluted Fabrazyme,

15     and, further, that he now cannot be treated any further.

16          MS. MONDELL:  Your Honor, to the extent the Court is

17     inclined to look at this particular plaintiff and find that

18     this particular plaintiff has met Rule 8 pleading standards,

19     the claim, nevertheless, fails because the gravamen of the

20     complaint is that there is a duty to manufacture Fabrazyme in

21     sufficient quantities to meet demand.

22          THE COURT:  Well, but there is also a duty, isn't

23     there, not to provide something that is going to cause harm to

24     an individual?  This is not a question of manufacturing

25     sufficient amounts.  This is a question of giving somebody

1    something that would cause harm to them, actual harm, and the

2    actual harm is you treat someone like Mr. Mooney with diluted

3    Fabrazyme, he develops or experiences an anaphylactic reaction.

4           So, you say they cannot just assert a cause of action

5    on the basis of manufacturing inadequacies, but they offered to

6    him a what I could view as a defective product, one that in

7    this dosage leads to a physical response.  It is not quite the

8    same as the lady with -- Ms. Lacognata in Carik, but it has

9    some of the characteristics.

10          What is the basic understanding about drugs from

11   Paracelsus?  There is no poison, there are only bad doses, and

12   here we are talking about an allegation of a bad dose.  They

13   gave him something that they should not have given him, and as

14   a result of that he has an anaphylactic reaction.  Now, why

15   isn't that enough?

16          MS. MONDELL:  The District Court in Utah has addressed

17   this particular point in the Schubert case.

18          THE COURT:  I have got it in front of me.  Let's see

19   where this was ruled out in Schubert.

20          MS. MONDELL:  In that case, your Honor, the Court

21   considered the same allegations that are made here.

22          THE COURT:  This allegation with respect to

23   anaphylactic response?

24          MS. MONDELL:  It was not an allegation with respect to

25   anaphylactic response, but it was an allegation that

1   Mr. Schubert did not receive dosing of Fabrazyme, and in that

2   case Mr. Schubert ultimately died as a result of the disease

3   progression with respect to Fabrazyme.

4        THE COURT:  Well, see, but the difference there is

5   that, on these pleadings and the pleadings that were available

6   to Judge Kimball, we have got this generalized allegation that

7   the disease progressed.  It calls to mind my grandfather's

8   periodic observation that a wink is as good as a nod to a blind

9   horse.  If it is going to happen anyway, it really does not

10  make very much difference, and that is what Schubert was about.

11       That is not what Mr. Mooney is about, if I look

12  carefully at it.  Mr. Mooney is about someone who is given a

13  drug that was an improper dose and being distributed by Genzyme

14  and marketed by Genzyme.

15       MS. MONDELL:  Well, your Honor, to be clear, the dose

16  that was provided was -- the drug that was provided, the

17  biologic treatment that was provided, was consistent with the

18  labeling.  When plaintiffs say that it was a diluted dose, it's

19  not as if what was provided was half as much as what would be

20  provided under normal circumstances within a given dose.  What

21  happened is that plaintiffs were receiving fewer doses within a

22  span of time.  I think there is a difference there.  The

23  gravamen of the complaint here and the gravamen of the

24  complaint --

25       THE COURT:  I want to stop with that, although I am

1    not sure it is material.  What does that mean?  The FDA

2    approves certain dosages, and there are time frames for those

3    certain dosages, right?  And you were not delivering dosages

4    consistent with that approval, right?

5         MS. MONDELL:  With that recommended dosing, that's

6    correct.

7         THE COURT:  So, whatever we call it, the recommended

8    dosing.  So, you are giving someone something less than the

9    recommended dosage.  I have got this generalized stuff that

10   that is a problem, and then I have got Mr. Mooney, and

11   Mr. Mooney has got this alleged reaction from the development

12   of antibodies to the diluted Fabrazyme, which states, it seems

13   to me, the basics of a negligence or products liability kind of

14   claim, and I want to understand why it would not here.

15        MS. MONDELL:  Our position, your Honor, is that the

16   complaint Mr. Mooney is making, to the extent it gets past the

17   Rule 8 standards, is a complaint that is Genzyme should have

18   been manufacturing more Fabrazyme so as to supply him with full

19   dosing throughout the period in question.

20        THE COURT:  Why isn't it a complaint that if they put

21   this in a stream of commerce in this fashion and it is

22   dangerous to someone and someone takes it and suffers harm,

23   that we have got a negligence problem, we have got a products

24   liability problem?  Notice is a little different.  But you were

25   out selling this product that is alleged to have caused this

1    specific harm to Mr. Mooney.

2           MS. MONDELL:  The alternative, your Honor, taking that

3    to its logical conclusion, would be for Genzyme not to sell the

4    product at all.

5           THE COURT:  Well, if we go back to Paracelsus, that

6    may be the answer, which is to say you do not sell poisons,

7    which is to say you do not sell product that is inherently the

8    wrong dosage.

9           MS. MONDELL:  And that is the problem that the

10   Schubert Court looked at, and the Schubert Court's opinion

11   found that it was appropriate for Genzyme to continue to

12   supply, to the extent that it was able to do so.

13          THE COURT:  I guess I am looking specifically at the

14   Schubert allegations, and it appears that he is saying that he

15   -- or it is being said with respect to Schubert, by his heirs

16   or personal representatives, that he took it, there was a delay

17   in getting the proper medication, and ultimately he died.  So,

18   this falls, I guess, in my grandfather's rubric.  He would have

19   died anyway, whether he took it or he did not take the drug in

20   its diluted form.

21          Here it is alleged with respect to Mr. Mooney that, by

22   taking this drug, something bad happened to him, the

23   anaphylactic treatment.  Now, not a model of precise pleading,

24   but unbundling it, it appears to have alleged with

25   particularity a plausible claim that Mr. Mooney, at least,

1   suffered from the use of a drug that the defendant was

2   manufacturing.

3        MS. MONDELL:  And the Schubert Court does analyze that

4   point at page 6, going on to say, "To the extent the plaintiff

5   is asserting that Dr. Schubert was harmed by not receiving the

6   full dose, the analysis is the same," and the Court --

7        THE COURT:  I guess, if we have got inherent pleading,

8   that is analysis by incorporation, so let us go back to what it

9   is that we are incorporating.  "The analysis is the same."

10  What does that mean here?  Does it mean that in Utah, if

11  somebody is sold a poisonous drug and they would have died

12  anyway, they do not recognize a cause of action?  I do not

13  think that is the law of Utah.

14       MS. MONDELL:  No.  The Utah Court is finding that

15  those circumstances, if a plaintiff, if Dr. Schubert there was

16  alleging that the harm was from not receiving the full dose,

17  the analysis would be the same as that in Lacognata.  It's the

18  same as the decision reached by the Florida Court in the

19  Eleventh Circuit there, and ultimately the Schubert court

20  concludes that Genzyme should not be penalized for producing as

21  much of the product as it could.

22       THE COURT:  If it were only that, that is clearly the

23  case, but that is not this, and I am not sure that -- I do not

24  think it is a Locagnata case, but it is a pretty

25  straightforward allegation with respect to, or at least I can

1    understand it as a straightforward allegation with respect to

2    that.

3             So, apart from <u>Schubert</u>, is there anything else that

4    would bear on that allegation?

5             MS. MONDELL:  What we have, your Honor, obviously, in

6    our papers addressed on 12(b)(6) grounds each of the claims

7    that plaintiffs have alleged, so we could certainly shift to

8    that set of arguments, if you wish.

9             THE COURT:  But I want to understand how, if I say

10   that there is injury in fact here with respect to Mooney, that

11   at least the -- I guess Mr. Mooney is from Ohio -- that Ohio

12   tort law -- and I would have to look fairly carefully -- I am

13   not even sure if there is some unfair practices act under Ohio

14   law that would be applicable, but at the bottom you have got an

15   Ohio tort law claim.  Is there anything else to argue about

16   that?

17            MS. MONDELL:  I think there are, again, points that

18   are addressed count by count in our papers.  For example, here

19   plaintiffs have stipulated to dismissal for claims of strict

20   liability for all Ohio plaintiffs.

21            THE COURT:  They may have.  This is not a strict

22   liability case, though.  This is not a strict liability

23   allegation.

24            MS. MONDELL:  It's one of the claims that they are

25   making in the case.

1          THE COURT:  But let me just get to the bottom of the

2     core of it, which would be an Ohio negligence claim or Ohio

3     products liability claim.  Is there something more to be said

4     about that?  The third-party-beneficiary stuff and that I will

5     deal with, and Bayh-Dole.

6          MS. MONDELL:  Your Honor, in our papers we have

7     addressed the Ohio authority for the proposition that statutory

8     products liability scheme there preempts common law remedies.

9          THE COURT:  So, it becomes an Ohio products liability

10    case.  Is there any reason why that would not be applicable

11    here, any further analysis as to that specific claim?

12         MS. MONDELL:  Not beyond what is in our papers, your

13    Honor.

14         THE COURT:  All right.

15         Well, is there anything further the parties want to

16    take up?

17         MR. KURZWEG:  Your Honor, I would make just one final

18    point on the class allegations that were made in the lawsuits.

19    In other words, these were filed on behalf of the plaintiffs in

20    their name --

21         THE COURT:  They were, but the Motion to Dismiss is as

22    to the named plaintiffs, so that is what I am treating this as.

23         MR. KURZWEG:  Would the class allegation survive, for

24    example, if the Court --

25         THE COURT:  No.  You do not have somebody here who can

1   represent a class.  That is why you get to the point of having

2   subsequent proceedings with respect to class allegations.  You

3   just do not make class allegations and up the ante.  They

4   decided to move to dismiss as to the named plaintiffs.  If they

5   dismiss as to the named plaintiffs, there is not a class case

6   remaining here.  That does not mean that somebody who is not in

7   the class cannot bring an action at some point.

8           MR. KURZWEG:  If, for example, the Court allows

9   Mr. Mooney's claim to go forward under the Ohio common law or

10  the Ohio statutory --

11          THE COURT:  I guess all those persons who have had

12  anaphylactic responses, maybe you will get to raise that, but

13  that is all you have got left here, at least in terms of the

14  argument that I have had, and I have tried to go through these

15  complaints in a fairly detailed fashion, and I have afforded

16  you the opportunity to tell me what is here.  But you will have

17  to see what the outcome is of a case that leaves just

18  Mr. Mooney in it for Ohio products liability violation.

19          MR. KURZWEG:  Thank you.

20          THE COURT:  All right.  So, I will take it under

21  advisement.  Nothing is happening in this case until I deal

22  with the Motion to Dismiss, and, depending on how the Motion to

23  Dismiss is resolved, then we will have a further scheduling

24  conference for further development of the case.

25          MR. KURZWEG:  Thank you, your Honor.

1             THE COURT:   Thank you.

2             THE CLERK:   All rise.

3        (The Honorable Court exited the courtroom at 9:50 a.m.)

4         (WHEREUPON, the proceedings adjourned at 9:50 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Reporter

5      of the United States District Court, do hereby certify that the

6      foregoing transcript constitutes, to the best of my skill and

7      ability, a true and accurate transcription of my stenotype

8      notes taken in the matter of *Adamo, et al. V Genzyme*

9      *Corporation*.

10

11

12

13

14

15      August 13 2014                    s/ *Brenda K. Hancock*
                                          Brenda K. Hancock, RMR, CRR
16                                        Official Court Reporter

17

18

19

20

21

22

23

24

25